**In re DOW CORNING CORPORATION, Debtor.**

**Bankruptcy No. 95–20512.**

United States Bankruptcy Court, E.D. Michigan, Northern Division.

Jan. 25, 1996.

Barbara J. Houser, Sheinfeld, Maley & Kay, P.C., Dallas, TX, for debtor.

*OPINION ON DEBTOR'S MOTION FOR APPROVAL OF COMPROMISE WITH THE DOW CHEMICAL COMPANY AND HOECHST MARION ROUSSEL, INC.*

ARTHUR J. SPECTOR, Bankruptcy Judge.

### Background

The matter before the Court is a contested motion by the Debtor-in-Possession for approval of a settlement with the Dow Chemical Company and Hoechst Marion Roussel, Inc. involving those parties' objections to the Debtor's Motion for Approval of Settlements with various insurance companies in which both the Debtor and the other companies are co-insureds. This opinion comes as a result of a long chain of events commencing with the filing of thousands of lawsuits against Dow Corning Corporation alleging personal injuries caused by Dow Corning's breast implants. Dow Corning tendered the com-

1. Hereafter, all statutory references are to this act unless otherwise noted.

2. The Dow Chemical Company, a 50% owner of the shares of the Debtor, as well as a co-insured on some of the Debtor's insurance policies, also

plaints to its many insurers, who, citing a variety of defenses, exclusions and the like, declined to defend or indemnify its insured. Dow Corning is now prosecuting a declaratory judgment action in the Wayne County, Michigan, Circuit Court against scores of insurance companies. In fact, the jury trial is reportedly very near its end as this is written.

On May 15, 1995, Dow Corning Corporation ("Debtor") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*[1] The declaratory judgment lawsuit continued despite the bankruptcy. In August, 1995, just prior to the trial judge's decision on various issues of law, some of which were dispositive, the Debtor and some of the then approximately 100 defendants settled the lawsuit, subject to this Court's approval. After a heated trial, lasting until 2:00 a.m. of the day of the state court's anticipated decision, and over the vociferous objections of the Official Committee of Tort Claimants (hereafter "TCC") and Hoechst Marion Roussel, Inc. ("HMR"), a company which is listed as a co-insured on some of the Debtor's insurance policies, the Court approved the settlement of the lawsuits with these insurers. That order is now on appeal by both objectors.

In the first week of October, 1995, the Debtor moved for the approval of settlements with ten more insurers. Again, the TCC objected. In addition, both HMR and the Dow Chemical Company ("Chemical")[2] objected, as did numerous other parties whose identities and objections are not relevant to this opinion, asserting that their interests as co-insureds of the policies prevented the Debtor from concluding the agreements. To better understand the subject matter of this dispute it is necessary to outline the objections of the co-insureds because in the settlements currently in dispute they are compromising some of these positions.

objected to the original settlements in August, but withdrew its objections on the basis of a side agreement which was ultimately embodied in the order approving those settlements.

The proposed settlements between the Debtor and the insurers are of two types. The first, which creates little conflict, is called a "coverage-in-place" agreement. In that form of settlement, the insurer agrees to abide by the terms of the insurance policy but the Debtor agrees to some reduction in the coverage limits. The second type involves a cash payout by the insurer in return for a release by the insureds of all rights to the policy. Because these are, after all, settlements, the Debtor agreed to discounts ranging up to approximately 25% off the face amount of the policies' coverages.

The Debtor's insurance program is extremely complex, and as one expert testified in connection with another contested matter, quite well conceived. It consists of layer upon layer of primary, excess and umbrella policies. As noted before, on some of the policies the Debtor is merely one of a number of companies listed as an insured. It has been asserted without contradiction that as to some (if not all) of these, Chemical bought the policies. Excess and/or umbrella coverage does not "kick in" until the lower levels of insurance coverage are exhausted.

It may be helpful to use one of the ten insurance company settlements as an example of how the arguments play out in the course of a cash-out settlement. On October 3, 1995, the Debtor moved for approval of a compromise with Federal Insurance Company. In general, the compromise provided that Federal would pay $13,900,000 (in addition to any other payments it had already paid the Debtor). Although no one is bound by it, and the Court does not make a finding as to it, a chart provided by the Official Committee of Unsecured Creditors ("U/S CC") in a brief involved with the ten insurance settlements proposes to quantify the discount off the policy's original coverage. According to the U/S CC, the limits for Federal's product liability coverage is $21 million. Because in the nature of insurance the coverage will be paid out over time as claims are made against it, it is fair to grant a present value discount for a cash payout. According to the chart, the present value of

the $21 million based on the U/S CC's assumptions is $15,435,627. U/S CC's Response to Debtor's Motions for Approval of Compromise of Controversy With Various Insurers, filed Dec. 5, 1995, p. 12. Because Federal is paying $13.9 million, the U/S CC computed that the Debtor gave a 9.9% litigation or risk discount. *Id.* For purposes of this dispute, the only other relevant terms are that the Debtor will release Federal from claims against the policy and will obtain releases from "other insureds including [Chemical] and other entities who may claim to be insureds under the Policies ...," including releases of any claim for bad faith. Motion for Approval of Compromise of Controversy with Federal Insurance Co., filed Oct. 3, 1995, p. 4.

The difference between the $13.9 million to be received by the Debtor and the $21 million face limits for product liability coverage creates what some have called a "gap" of $6.1 million from the point of view of Chemical.[3]

Chemical's objections to this settlement are as follows:

1. The Debtor is not presently entitled to policy proceeds and has no need to liquidate them at sharp discounts for breast implant claims of limited, if any, value. Other than costs incurred by the Debtor defending itself against breast implant lawsuits, because the Debtor has never paid any money to a plaintiff, it has not experienced a "loss" for purposes of the policy. Because the personal injury lawsuits are stayed, the Debtor will not likely be making any payments until after a plan is confirmed. Furthermore, it is unlikely that it ever will have to pay because the claims lack merit.

2. The relief requested can only be granted in an adversary proceeding because the Debtor is in essence seeking a determination of the extent of Chemical's interest in the policy and other forms of equitable relief.

3. The Court lacks jurisdiction to allow the Debtor to "sell" property interests which are not part of its estate. Since only the Debtor's *interest* in the insurance policy, and not the policy itself is property of the estate,

---

**3.** I believe that HMR is not a co-insured of this particular policy. But its arguments are substantially the same as Chemical's and I use this policy only to illustrate a concept.

the Debtor can sell or discount only its own interest, not the entire policy. The Court cannot force Chemical to release its rights in the policy or its bad faith claim.

4. Even if the Court had such authority, it could not be exercised without providing Chemical with adequate protection of its rights.

In strictly business terms, Chemical complains that it has its own products on the market which are subject to or potentially subject to lawsuits. The settlements pose three types of threats to Chemical's business. First, by allowing one of its co-insureds to gobble up such a large, disproportionate and unjustified share of the product coverage limits, it leaves too little available for Chemical. Second, whatever would have been left over for Chemical is being released so Chemical would have no access to the $6.1 million gap. And finally, it jeopardizes Chemical's rights to access higher level excess and umbrella policies. If Chemical should ever present a claim upon one of these policies, the insurer might argue that the lower level coverage, in this instance, under the Federal policy, was not exhausted and therefore the higher level excess insurer has no contractual duty to pay.

Chemical's brief in support of its objections cited strong authority for several of its arguments, most notably the lack of authority to prejudice its independent rights. These arguments are forceful. If any objection is sustained, of course, the insurance settlements would be scuttled. And because the Debtor is relying on these settlements to serve as a template for settlements with many other insurers involved in the Wayne County litigation, the failure to approve these ten settlements will have vast repercussions. It will cause the Debtor to risk litigation of the remaining insurance assets including years of anticipated appeals and possibly re-trials and new appeals. Since the insurance coverage is so large a part of the Debtor's total assets, any delay in accessing these limits would inevitably delay the administration of this case. From the Debtor's perspective then, a lot is riding on these ten settlements.

For this reason, the Debtor diligently attempted to resolve these objections. HMR, Chemical, and the Debtor eventually reached a settlement, whereby HMR and Chemical would withdraw their objections to the pending motions to approve the ten insurance compromises and HMR will dismiss its appeal of the prior order approving such a compromise. It is this settlement which is the subject matter of this opinion.

On December 27, 1995, the Debtor filed its motion for approval of its settlement with HMR and Chemical. Attached to the motion were two exhibits which separately stated the terms of the agreements with each of the settling companies. All three companies were referenced in the HMR term sheet and consideration ran to and from all of them. Only the Debtor and Chemical are referenced in the other term sheet, which the parties denominated their "Insurance Escrow Agreement."

In return for withdrawing its appeal and objections to the ten insurance settlements and for not objecting to others like them in the future, HMR would receive 2% of the proceeds recovered by the Debtor now and so far, and 2½% of any future recoveries. These payments would, of course, come from proceeds of only those policies in which HMR is a co-insured with the Debtor. There is also a complicated arrangement for HMR to assign, if it wishes, certain claims against policies to Chemical and/or the Debtor, which provisions arise out of indemnities which Chemical gave HMR when Chemical sold its Marion Merrell Dow, Inc. subsidiary to Hoechst Corporation on June 28, 1995. The U/S CC, representing all creditors whose claims are not represented by the TCC, supported the motion to approve this compromise. The TCC, however, opposed it.

The Chemical settlement is more complex. It provides that Chemical withdraw its objections to the pending insurance settlements and to further insurance settlements like them. The parties' interests in the insurance policies will follow the proceeds of those policies which will be held in escrow. All arguments regarding the allocation of those proceeds between the Debtor and Chemical are reserved, and cannot be raised any earli-

er than the first hearing on a disclosure statement. The agreement provides details regarding investment parameters for the escrowed funds and a complicated set of formulas for allocation under various agreed hypothetical circumstances such as in the event the insurance proceeds turn out to be greater than the amount of allowable claims against them. The agreement also provides a limited opportunity for the Debtor to withdraw a small portion of the escrowed funds upon certain prescribed circumstances and after notice and a hearing. Chemical can, from time to time, but not sooner than the first hearing on a disclosure statement, request disbursements to it from the escrow in payment of its own claims for insurable losses. Finally, in the event of a dispute regarding disbursements from the escrow, the agreement provides that no funds may be disbursed until a final order of the Court, inclusive of appeals through the Supreme Court.

The TCC has numerous objections to the approval of these agreements. First, it argues that a term contained in both agreements is illegal or impossible. Both agreements provide that their terms apply retroactively to insurance settlements already approved by the Court. Since the order approving those settlements is on appeal, this Court is powerless to modify it.

Second, the TCC objects to paying anything to HMR at this time because it is entirely likely that HMR will never have a claim which would trigger access to the policies being cashed out, and so the payments are a waste of money.

Third, the TCC continues its claim (that it unsuccessfully argued in conjunction with the earlier insurance settlements approved in August) that the individual tort claimants themselves have a property interest in the insurance. Therefore, the payment of 2% or 2½ of the insurance proceeds to HMR improperly deprives the claimants of their property. And, of course, should the time come that Chemical makes a demand for a disbursement under the escrow agreement, the TCC would make the same objection.

Fourth, the TCC objects to approval of this agreement because the agreement keeps changing from day to day. Indeed, the Debtor and Mr. Gilbert conceded that a few terms, which they denominate as "minor" or "non-material" have changed, but actually involve only the rights and obligations of HMR and Chemical *inter sese,* and only minimally impact on the Debtor. Nonetheless, the TCC objects that it is being asked to shoot at a "moving target."

Fifth, the overriding objection of the TCC (which the U/S CC formerly held) is that the insurance escrow agreement between the Debtor and Chemical "would give Dow Chemical virtual veto power over consummation of a plan in this case." Statement of Alfred Lurey, Esq., Counsel for Tort Claimants Committee, Transcript Jan. 22, 1996, p. 22, lines 16–18. The agreement does this, according to the TCC, because it would allow Chemical to delay access to the proceeds of the insurance settlements for years while it appealed an order of this Court, including any confirmation of a plan. This would hold up disbursements to creditors, including those tort claimants who are sick and dying. The leverage which Chemical could exert would impact markedly on the negotiating postures leading up to a plan.

Sixth, these settlements "constitute creeping plans of reorganization." Transcript, p. 34, lines 22–23. These settlements are not simple agreements to allow the Debtor to discount the policies and hold the proceeds pending further order of the Court. Instead, as counsel for the TCC put it in closing argument, these agreements have "all kinds of bells and whistles." Transcript at p. 35, line 2.

Seventh, the TCC reminds the Court that with respect to the Chemical settlement, this is a settlement between related parties as Chemical is the Debtor's parent company. Because of the tremendous benefit that, according to the TCC, Chemical receives out of this agreement, the agreement cannot withstand the greater scrutiny that insider deals require.

Originally, the U/S CC also objected to the Chemical settlement. However, after the proofs and arguments were concluded, and

while this opinion was being drafted, that committee filed a withdrawal of its objection. Accordingly, the posture now is that the only opposition to either settlement is by the TCC.

The motion was tried, with only one witness testifying, on Monday, January 22, 1996. Scott Gilbert, a partner in the law firm of Covington and Burling, and who specializes in insurance disputes, testified for the Debtor in support of the motion. Mr. Gilbert negotiated and largely drafted the underlying insurance settlement agreements. He also negotiated and largely drafted the agreements with HMR and Chemical. His testimony explained the terms of the HMR and Chemical agreements. He also explained the goals which the Debtor hoped to achieve and how the agreements satisfied them. It is fair to say that his testimony provided strong support for a determination that the settlements were good for the estate and ought to be approved.

Having considered the testimony, the arguments of the parties, and the briefs submitted, the Court now enters its findings of fact and conclusions of law, pursuant to F.R.Bankr.P. 7052, with respect to this contested matter. As a preliminary matter, the Court concludes that it has jurisdiction over this dispute pursuant to 28 U.S.C. § 1334 and § 157(a). This is a core proceeding. 28 U.S.C. § 157(b)(2)(A).

## DISCUSSION

This Court has authority to approve the proposed settlements pursuant to Bankruptcy Rule 9019(a), which provides: "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." F.R.Bankr.P. 9019(a). In *Protective Comm. for Independent Stockholders of TMT Trailer Ferry Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968), the Supreme Court stated that "[c]ompromises are a normal part of the process of reorganization. In administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts." And, of course, the law favors compromise.

*In re A & C Properties,* 784 F.2d 1377, 1383–84 (9th Cir.1986); *In re Joint Eastern & Southern Dist. Asbestos Lit.,* 129 B.R. 710, 861 (E. & S.D.N.Y.1991).

Though *TMT Trailer* involved the approval of a compromise that formed part of a reorganization plan, settlement agreements may also be entered during the reorganization proceedings. *In re Texaco, Inc.,* 84 B.R. 893, 901 (Bankr.S.D.N.Y.1988). Whether the compromise is effected separately or in the body of a reorganization plan will not affect the approval analysis required of the bankruptcy court. *See In re Drexel Burnham Lambert Group, Inc.,* 134 B.R. 493, 496 (Bankr.S.D.N.Y.1991).

A proposed settlement should only be approved by the bankruptcy judge upon a determination that the settlement is "fair and equitable." *TMT Trailer,* 390 U.S. at 424, 88 S.Ct. at 1163. When considering whether to approve a proposed settlement, "the bankruptcy court is charged with an affirmative obligation to apprise itself of the underlying facts and to make an independent judgment as to whether the compromise is fair and equitable. The court is not permitted to act as a mere rubber stamp or to rely on the trustee's word that the compromise is reasonable." *Reynolds v. Commissioner of Internal Revenue,* 861 F.2d 469, 473 (6th Cir. 1988) (citing *In re American Reserve Corp.,* 841 F.2d 159, 162–63 (7th Cir.1987)). However, the court need not conduct a "mini-trial on the merits of the settlement." *Drexel Burnham Lambert,* 134 B.R. at 496; *In re Energy Co-op., Inc.,* 886 F.2d 921, 927 n. 6 (7th Cir.1989). Instead, the obligation of the court is to "canvass the issues and see whether the settlement 'falls below the lowest point in the range of reasonableness.'" *Drexel Burnham Lambert,* 134 B.R. at 497 (quoting *In re W.T. Grant Co.,* 699 F.2d 599, 608 (2d Cir.1983), *cert. denied, Cosoff v. Rodman,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983)).

In determining whether a proposed settlement agreement is fair and equitable, many courts have recited that courts should consider the following factors:

1. The balance between the likelihood of the plaintiff's or defendant's success should

the case go to trial compared to the present and future benefits offered by the settlement;

2. The prospect of complex, costly and protracted litigation if settlement is not approved;

3. The proportion of class members who do not object or who affirmatively support the proposed settlement;

4. The competency and experience of counsel who support the settlement;

5. The relative benefits to be received by individuals or groups within the class;

6. The nature and breadth of releases to be obtained by officers and directors; and

7. The extent to which the settlement is the product of arm's length bargaining (i.e. whether the agreement was reached between insiders without creditor participation).

*See Texaco,* 84 B.R. at 902; *Connecticut General Life Ins. Co. v. United Companies Financial Corp. (In re Foster Mtg. Corp.),* 68 F.3d 914 (5th Cir.1995). This list is comprehensive but not inclusive. As the Court in *TMT Trailer* stated, the bankruptcy court should consider "... all ... factors relevant to a full and fair assessment of the wisdom of the proposed compromise." 390 U.S. at 424, 88 S.Ct. at 1163.

▮▮▮ The bankruptcy court's determination of whether to approve the proposed settlement must reflect an adequate and intelligent consideration of the merits. *TMT Trailer,* 390 U.S. at 434, 88 S.Ct. at 1163. This of course entails a thorough analysis of each relevant factor and cursory statements such as "the alternative to settlement was extensive litigation at heavy expense," is not sufficient. *Id.* The Court explained that the

trial court's decision must be "the result of an adequate and intelligent consideration of the merits of the claims, the difficulties of pursuing them, the potential harm to the debtor's estate caused by delay, and the fairness of the terms of settlement...." *Id.*

▮▮▮ The clearest way to address these factors is in the order presented above. The discussion of these factors follows.

**1. The balance between the likelihood of success compared to the present and future benefits offered by the settlement.**

As noted above, the arguments of HMR and Chemical as to the legality of allowing the Debtor to compromise away their independent property interests in the insurance policies are formidable and are supported by recent authority by appellate courts. Should their objections be sustained, a major part of the Debtor's business plan would be seriously jeopardized. The agreements allow the Debtor to dodge this cannon shot. The present and future benefits of the agreements are therefore substantial as is the risk of loss on the merits.[4]

**2. Prospect of complex and protracted litigation if settlement is not approved.**

If the settlement is not approved, the litigation over the approval of the ten insurance compromises will continue. Chemical and HMR settled their dispute over these compromises before it was their turn to call witnesses. It would be only fair, therefore, as the Court previously ruled, to reopen the proofs to allow these parties to make the case that the insurance contracts do not permit the Debtor to unilaterally settle litigation

---

4. I take this opportunity to note how difficult this finding is for a judge who would ultimately have to make the decision on the merits. When a bankruptcy court is reviewing a settlement of a state or other non-bankruptcy court action, it can impartially weigh the merits of the parties' relative positions with detachment and a modicum of comfort. Not so, however, when the prognostication is of what the result would likely be if the matter being settled is instead being litigated and would be decided by the one performing the prognostication.

Because the objections of HMR and Chemical to the ten insurance settlements have not yet been fully tried, it cannot be said for sure what the outcome would be. And of course, a judge should not be offering a preview of a decision yet to be made. By calling the objections of HMR and Chemical to the approval of the ten settlements "substantial" and their arguments "formidable," therefore, I do not intend to flash any signal as to the actual outcome of those contested matters. Instead, as the record of these proceedings will demonstrate, it is no secret that I have agonized over the pros and cons of this "legality" argument.

against an insurer in a way which will prejudice the co-insureds.

While this litigation will not be complex, it might pose an issue of first impression. In the course of the hearing on the approval of the ten insurance settlements, the Court posed a hypothetical meant to expose the underlying issue involved in the "legality" attack. Assume a policy of insurance in which A and B are co-insureds. Assume A has a claim to make on the insurance policy which would exhaust the limits, but fails to do so within the policy's strict time limits, thus giving the insurer a contractual defense to the claim. Assume further that the insurer fails to raise this technical defense and instead pays the claim. Does B have a cause of action against the insurer for improperly paying a defensible claim to A which exhausts the policy limits? This hypothetical lays the ground work for further argumentation. If B has no cognizable cause of action against the insurer for its failure to assert a contract defense, then how could B maintain an action against the insurer if the defense were raised, litigated with A, and then compromised? Since contractual defenses to the Debtor's claim are the subject matter of the Wayne County litigation, and the compromise thereof is the subject matter of the underlying dispute here, this hypothetical question becomes highly relevant. While Chemical's prehearing memorandum in support of its objection to the Debtor's settlements, filed December 5, 1995, attempts to address this question, the authority it cited is not terribly strong. On the other hand, the Debtor failed to respond at all. The Court therefore foresees having to pass upon what may very well be an issue of first impression.

Moreover, Chemical and HMR assert some form of contract arguments. Chemical claims that it was the only one of the co-insureds authorized to deal with the insurers. Its witnesses, presumably, will attempt to make out such a contract theory or at least a course of dealing. As stated, the Court does not see these questions as being unduly complex, but they are certainly difficult.

The litigation would not be "protracted" because such a hearing would probably be concluded next month, and after only perhaps at most a day's worth of testimony. However, one can feel quite confident that no matter what the outcome of such litigation at the trial court level, it will be followed by years of appeals. If the term "protracted litigation" is meant to include the years involved in the appellate process, then the Court must and does find that the litigation would be protracted if the settlement is not approved.

On the other hand, because the TCC has its own independent set of objections to the approval of the underlying insurance settlements, the fact that HMR and Chemical might appeal from an adverse decision approving those settlements would be of no consequence, since surely the TCC would also appeal. Thus by removing Chemical and HMR as an impediment through these proposed side settlement agreements the Debtor assures itself only of a better chance of having its insurance settlements withstand the appellate process, but not of avoiding it in the first instance. Accordingly, this factor does not predominate in either direction.

**3. Proportion of creditors [5] who do not object or who affirmatively support the proposed settlement.**

Factors are enunciated to help guide a trial court in exercising its discretion. However, it is this Court's experience that frequently the factors are so vague as to raise more questions than they answer. In the context of this case, at least, that seems to be the case with respect to factor # 3.

How is a court supposed to create a "proportion" from the claims in this case? Since we know that the TCC opposes both settlements and that the U/S CC (at least now) approves of both settlements, do we say that the creditors are evenly split, and so the proportion is 50%? But the TCC represents

5. This factor is usually stated as "proportion of the class members who do not object or who affirmatively support the proposed settlement." However, that formulation is not well-suited for purposes of this settlement or probably most settlements subject to bankruptcy court approval since it seems to presume that the settlement impacts only a particular class of creditors or interest holders. As here, that usually is not the case.

hundreds of thousands of individuals (maybe even a million or more) who will assert billions of dollars of hotly disputed claims against the estate. The U/S CC represents all other creditors, about 2000 in number, holding approximately $1.2 billion of undisputed liquidated claims against the estate. Should the Court instead compute their proportion by saying that perhaps a million creditors oppose them versus 2,000 who support them? Or, should we do an informal estimation and say that multiple billions of dollars of tort claims oppose the settlements while a "mere" $1.2 billion of commercial claims support them? Or finally, does the Court weigh the votes only of allowed claims? If that is the case, then the tort claimants would be clearly outvoted because their claims are scheduled as disputed. And since they have largely not filed any proofs of claim as of this time, for purposes of discussion, we could easily say that there are no allowed tort claims at the present time. On the other hand, because the $1.2 billion of commercial claims were scheduled by the Debtor as liquidated, not contingent and undisputed, by virtue of § 1111(a) these claimants all have allowed claims.

Neither the TCC nor the Debtor offered any guidance on this question, and in the very short time allotted to the Court to make this decision, we could find nothing on point. Suffice it to say, therefore, that the Court is unable to make a finding as to the proportion of creditors who support versus oppose the two settlements because the Court is unable to "compare apples with oranges."

**4. The competency and experience of counsel who supports a settlement.**

Scott Gilbert testified in connection with other contested matters in this case and so his background and experience are well known to the Court. He is perhaps one of the leading attorneys of this niche of the law. This factor weighs very heavily in favor of the settlements.

**5. The relative benefits to be received by individuals or groups within the class.**

In connection with this contested matter, this factor has no relevance.

**6. The nature and breadth of releases to be obtained by officers and directors.**

In connection with this contested matter, this factor has no relevance.

**7. The extent to which settlement is the product of arms-length bargaining.**

The undisputed and unimpeached testimony of Mr. Gilbert was that the negotiations were difficult in substance and in manner, and right up there in terms of heatedness with his negotiations with the insurers. While it is true that, with respect to Chemical, Gilbert was negotiating a settlement between related parties, his characterization of the negotiating process was that it was highly contentious. The Court's own perception of the vehemence of the parties' disagreements when Chemical argued its objections to the ten insurance settlements is to like effect. Accordingly, the Court finds that both settlements are the products of arms-length bargaining.

### Recapitulation and TCC's Arguments

■ Of course, there is more to the process than merely toting up the factors and then deciding how many support approval and vice versa. As is the case in deciding whether to grant an injunction, if a small handful of factors strongly predominate in favor of one side, it may outweigh a much larger number which tend the other way. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229–1230 (6th Cir.1985). But here those few factors that are relevant tend to support approval of the two settlements.

Nonetheless, the TCC raised substantial arguments which ought to and will be addressed.

The TCC argues that the provision in both settlements which would permit them to apply to insurance settlements approved in August in an order which is now on appeal impermissibly modifies the terms of that order. Originally, Chemical objected to the approval of the August settlements and only withdrew its objection when language was inserted in the order approving the settlements which provided that the proceeds of the settlement would be held in escrow and Chemical's rights to the proceeds would be

preserved. The specific provisions of that order which the TCC claims would be modified by the new agreements stated that the settlement funds may be used "solely for the purposes provided in the Settlement Agreement and consistent with this Order...." Order Authorizing and Approving Compromise and Settlement Between Dow Corning Corporation and Hartford Accident and Indemnity Company ... p. 5, ¶ 3. Paragraph 11 of the order further provides that the Debtor will not disburse the settlement funds without a final nonappealable order of the Court after notice and a hearing. It contains this proviso:

> Provided, however, that the funds shall only be disbursed pursuant to any such order for paying future or past Allocated Expenses, Generic Expenses or Liability Payments or payments as approved by order of the Court, which may include payments for past, present or future claims of other insureds as are determined by any such order to be covered by any of the Policies, in accordance with the parties' respective rights.

While the TCC is undoubtedly correct that this Court is divested of jurisdiction to modify its own orders that are now the subject of appeal, that is not what is happening here. The previous order specifically stated that the co-insureds, which would include HMR, would be permitted to request funds recovered by the Debtor under those settlements and the Debtor would be permitted to disburse such funds on account of any "past, present *and future claims* against the Insurers by ... other named insureds...." (Emphasis added). By virtue of the settlement agreement with HMR, the Debtor is agreeing to a disbursement from the fund obtained in the August settlement to the extent of 2% of the funds obtained from insurance policies in which HMR was a co-insured. This agreement is specifically contemplated under the prior order. Accordingly, this objection will be overruled.

The TCC's objection to paying any money at this time to HMR totally misses the point of settling. No one disputes that HMR might never have a claim against the policies which are being compromised by the Debtor.

But, then again, it might. HMR is a very large pharmaceutical company, and pharmaceutical companies get sued rightly or wrongly for product liability. The Debtor quite properly made the business judgment that it is worth what its witness characterized as nuisance value to foreclose the possibility that HMR might indeed have significant claims against these policies sometime in the future. Nothing in the record contradicts that business judgment. Therefore, this objection will be overruled.

The TCC has consistently maintained that each individual who claims a right to recover damages from the Debtor arising from product liability or other tort claims which would be covered by the Debtor's liability insurance policies has a property interest in those policies. Its theory is not without some precedent. However, in the August hearings, the Court overruled this objection. This objection was likewise raised in the TCC's own objections to the ten settlements, approval of which are still pending. A fuller explication of why the Court previously rejected this property rights theory in August and why it rejects it now will be provided in connection with the Court's decision on the pending ten insurance settlements.

The TCC argues that if the provision buying off HMR is such a good deal from the Debtor's viewpoint, it ought simply to pay these sums out of its own corporate funds and leave the insurance settlements funds alone. If its position that the tort claimants do have individual property rights in the policies is ultimately vindicated, the insurance funds ought to be there whole, not reduced by 2% or 2½%. The U/S CC also had a variety of suggestions for rewriting these deals in what it felt was a less objectionable way, which of course it has now withdrawn. But these are settlements with two other large and strong-willed corporate entities. Compromises are just that, and they are rarely perfect. Experience teaches that "ideal proposals obstruct action or, as has been said, the best is the enemy of the good." Herbert Stein "A Presidential Budget Message," *Wall Street Journal*, Friday, January 19, 1996, p. A12.

Finally, if the TCC's property right argument were ultimately vindicated, its constituents could be allowed a super-priority to compensate them for the use of their funds in "buying-off" HMR. *See, e.g.,* 11 U.S.C. § 507(b). And in this case, with the Debtor's enormous wealth, a super-priority really means something. Therefore, this objection will be overruled.

Mr. Gilbert testified about three changes from the original three-party agreement which was attached to the motion for approval. The most significant of these, as argued by the TCC, is the change in HMR's duty to assign claims against insurers to the Debtor and Chemical. Originally that duty was fixed. Under a recent modification, HMR will have the discretion to assert its own claim against an insurer or to assign it. The whole issue of these assignments arises from Chemical's indemnities to HMR given when the sale of Marion Merrell Dow closed last summer. Mr. Gilbert testified that the Debtor would not have asked for assignments from HMR; the provision existed at all only at Chemical's request. No contrary evidence tending to show the importance of this assignment provision was received. The Court finds that as far as the estate is concerned, the provision for assignments in the original agreement was not material, and neither is this minor modification.

The second change is a clarification in the term "termination date." A sentence clarifying that term was placed on the record and the parties stipulated that if an order is entered approving these settlements it should include such a clarification.

The third involved a clarification of the timing of the 2% and 2½% payments to HMR. That, too, is no real modification and is clearly not material. This objection, too, will be overruled.

Perhaps the major objection by the TCC is that the settlement with Chemical will tilt the playing field markedly in favor of Chemical and to the detriment of the other participants, especially the tort claimants. While the Court should be and is wary of attempts to tilt the playing field, such results cannot always be avoided. Nearly every decision a court renders will cause such an effect. The best a court can do is to avoid doing so unnecessarily or prematurely.

The crux of the TCC's argument turns on the esoterica of stays pending appeal. The specific provision of the insurance escrow agreement which draws the attention of the TCC (and previously the U/S CC) is paragraph 7. It states:

7. Any distribution of any monies in any Settlement Fund shall be only on Order of the Bankruptcy Court consistent with the rights of interested parties in the relevant policies, after hearing on at least 30 days notice. Any Order of such Court establishing a separate, segregated account for Settlement Funds shall include the following provisions:

(a) Any request for distribution filed with the Bankruptcy Court shall be accompanied by supporting documentation showing the specific payments for which reimbursement is sought, and, where appropriate, exhaustion of applicable underlying limits by actual payments or agreed exhaustions.

(b) Objections to requests for distribution must be filed within 21 days after service of notice of hearing, unless a longer time is established by Order of the Court.

(c) Any decision by the Bankruptcy Court with respect to any right to or request for distribution of Settlement Funds shall be subject to appeal to the United States District Court, the Sixth Circuit Court of Appeals and the United States Supreme Court, and no funds shall be distributed from any Settlement Fund until all appellate rights are exhausted.

The TCC worries that if the term "Order of the Bankruptcy Court" in paragraph 7 includes the order confirming a plan of reorganization, then Chemical would be able to tie up the funds for an inordinately lengthy period of time, to the detriment of the tort claimants. By its reading of the provision, none of the funds which were or would be generated from insurance settlements would be available to the Debtor for payment on claims if Chemical rejected the plan and ap-

pealed its confirmation. Indeed, if anybody appealed confirmation, it would tie up the funds.

Unless there is a consensual plan to which none of the possibly million parties in interest objected, the likelihood of someone appealing the confirmation order is substantial. Therefore, at least according to the Debtor, Chemical does not have any veto power.

The TCC's response is that even if someone appealed the order confirming the plan, the Debtor could proceed to consummate the plan by paying out claims, thereby perhaps mooting such an appeal. The only way that could not happen, according to the TCC, is if the Court were to grant a stay pending appeal. However, under the Insurance Escrow Agreement, Chemical would not need to even apply for a stay pending appeal because the terms of the settlement specifically bar the Debtor from making any payment until a final non-appealable order is obtained. Since Chemical, as testified by Mr. Gilbert, has an extremely litigious reputation, it would not be unlikely to see Chemical take an appeal to the Supreme Court, thus tying up consummation of the plan for years.

Seeking a stay of a confirmation order in a chapter 11 case as huge as this one is quite a difficult undertaking. However, as the Debtor explained, Chemical would not likely be required to post an enormous bond if the issue it is appealing is merely title to a particular asset. When an asset is sold free and clear of liens and interests, with such liens and interests to follow the proceeds, it would seem unfair to allow the proceeds of such a sale to be disbursed before an appeal is concluded and to thereby perhaps moot the appeal of the party who claims an adverse interest in it. Therefore, it would not be unlikely that some form of stay barring disbursement of the specific funds in dispute would be granted in the event of a Chemical appeal.

It is understood that Chemical has reserved the argument that the Debtor would not have experienced a loss under the insurance policies until it suffered judgments in favor of the tort plaintiffs, and consequently it could not disburse any of the insurance settlements funds merely as a result of plan confirmation. *But, cf. In re UNR Industries,* 942 F.2d 1101 (7th Cir.1991).[6] But the Debtor could use unrestricted corporate funds to begin the disbursement process, could borrow to make the payments or even issue equity securities to fund the disbursements notwithstanding the freeze of the insurance proceeds. Indeed, a plan could include such a provision as an alternative in the event of an appeal.

The ten insurance settlements presently pending provide that distribution of the proceeds of these settlements could not be made until entry of a final nonappealable order. Thus at least with respect to the funds generated by these ten settlements, Chemical is gaining no additional leverage by adding a similar provision to the Insurance Escrow Agreement. For these reasons, this objection by the TCC will be overruled.

The TCC argues that these settlements "constitute creeping plans of reorganization." This term first appears in *In re Continental Air Lines, Inc.,* 780 F.2d 1223, 1227 (5th Cir.1986). It represented a refinement of that court's earlier denunciation of a particular § 363(b) sale of substantially all of the estate's assets in *In re Braniff Airways, Inc.,* 700 F.2d 935, 940, *rehearing denied* 705 F.2d 450 (5th Cir.1983), where the court stated that the contemplated transaction "had the practical effect of dictating some of the terms of any future reorganization plan.... The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets." Since then, the term has appeared only three times. *See In re Ionosphere Clubs, Inc.,* 100 B.R. 670, 674 (Bankr. S.D.N.Y.1989); *In re Terrace Gardens Park P'ship,* 96 B.R. 707, 714 (Bankr.W.D.Tex. 1989); *In re BKW Systems, Inc.,* 69 B.R. 81 (Bankr.D.N.H.1987). It is not clear whether the TCC is referring to the settlements with HMR and Chemical only or to those and to

6. The Insurance Escrow Agreement preserves the Debtor's right to press for the *UNR* rule and even to argue that the policy limits are being accessed via the cash-out settlements themselves.

all of the settlements with the insurance companies as well. Either way, the objection will be overruled.

Clearly, the Debtor is properly attempting to settle significant litigation with its insurers over one of its principal assets, the insurance policies. The complex nature of the dispute and the enormous amounts involved dictate the need for something more than a plain vanilla order in many of these settlements.

"The degree to which the transaction would restrict the debtor's options in formulating a plan" is an additional relevant consideration when approving a compromise. *Cf. BKW Systems, supra.* However, "when an objector to a proposed transaction ... claims that it is being denied certain protection because approval is sought ... [outside] a reorganization plan, the objector must specify exactly what protection is being denied." *Continental Air Lines,* 780 F.2d at 1228. With regard to the settlements before the Court presently, the TCC fails to identify what protection is being denied. It also fails to identify any particular provisions which are problematic on this score except, perhaps paragraph 8 of the Insurance Escrow Agreement. That paragraph merely allocates the ownership rights between Chemical and the Debtor in the event that it turns out that there is a surplus of proceeds after all allowed claims are paid. There is nothing sinister about two joint owners of an asset agreeing through a settlement of a dispute how to divide up unencumbered proceeds of the liquidated asset. This hardly constitutes a creeping plan of reorganization, especially when contrasted with the facts in the *Braniff Airways* case.

The TCC argues that these are not just any settlements. Especially with respect to the settlement with Chemical, they are deals between related parties. The case law clearly holds that when a debtor in possession seeks to settle a dispute with its parent company or with another related party, the court should give greater scrutiny than in the usual case. The Court has done so here.

During the closing arguments, after trial, the Court raised on its own, the recently decided *Foster Mtg.* case, *supra* at p. 421–22.

In that case, the Fifth Circuit reversed and vacated a settlement between the Debtor and its parent corporation which was opposed by the overwhelming body of creditors. At the time this case was mentioned, both the U/S CC and the TCC were opposing the approval of the Chemical settlement. While the *Foster Mtg.* case recognizes that there should be no per se rule allowing a majority of creditors in interest to veto a settlement, it is fair to say that the Court at that moment was strongly weighing this precedent. Since that time, of course, the U/S CC has switched sides and now approves of both settlements.

For the reasons stated above, the Court concludes that both settlements were arrived at after arms-length fair negotiations. It is the Court's opinion that the settlements do not unfairly benefit either side nor prejudice in any material way any of the significant rights or objectives of the Debtor's estate. And it is clear that, by removing a major impediment to implementing the Debtor's plan of settling as many of its insurance disputes as it can, the agreements significantly benefit the estate. It is therefore the Court's conclusion that the settlements are in the best interest of the estate and ought to and will be approved.