**In re DOW CORNING CORPORATION, Debtor.**

Bankruptcy No. 95–20512.

United States Bankruptcy Court,
E.D. Michigan,
Northern Division.

Aug. 16, 1996.

Barbara J. Houser, Dallas, TX, Craig J. Litherland, Houston, TX, George H. Tarpley, Dallas, TX, Millie A. Sall, Houston, TX, for Debtor in Possession.

Lenard M. Parkins, Anne M. Ferazzi, Houston, TX, for Official Committee of Tort Claimants.

Ogden N. Lewis, Donald S. Bernstein, New York City, Sheryl L. Toby, Detroit, MI, for Official Committee of Unsecured Creditors.

## OPINION ON AUTHORITY OF OFFICIAL COMMITTEE OF CREDITORS TO ENGAGE IN LOBBYING

ARTHUR J. SPECTOR, Bankruptcy Judge.

### INTRODUCTION

The Court previously signed an Order, dated September 21, 1995, authorizing the Official Committee of Tort Claimants ("TCC") to retain a number of different law firms, including Vernor, Liipfert, Bernhard, McPherson & Hand, Chartered ("V & L"), to represent it in this bankruptcy proceeding. To prevent duplication of services, the Order specifically set forth how the various responsibilities are to be allocated among the retained counsel. Presently, the services pro-

vided by V & L consist of: (1) "primary responsibility for matters relating to the estimation and valuation of tort claims against the Debtor;" (2) "develop[ing] and implement[ing] a comprehensive, cost efficient and expeditious claims resolution process;" and (3) shared responsibility "for negotiating, formulating and drafting a plan of reorganization." Amended Application of [TCC] for Order Approving Retention of Counsel at 4–5.

On March 7, 1996, the TCC filed an application seeking to expand V & L's scope of retention. If approved, V & L would be permitted to lobby certain governmental agencies and legislative groups, at the bankruptcy estate's expense, in order to counter alleged current lobbying activities of Dow Corning Corporation ("Debtor").[1] For various reasons, a hearing on the matter did not take place until June 20, 1996.

According to the TCC, the Debtor is currently engaged in lobbying efforts which, if successful, would negatively affect the rights of tort claimants in this case. To begin with, the TCC "believes that [the Debtor] is orchestrating an effort to lift the FDA moratorium on silicone breast implants." Application of [TCC] For Order Supplementing Retention of [V & L] ("Application") at 2. In the TCC's view, "[t]he purpose of this strategy must be to decrease the value of the tort claims since [the Debtor] is no longer in the breast implant business and, therefore, does not need the FDA moratorium lifted." *Id.* The TCC also asserted that the Debtor, without inviting the TCC to participate, is discussing prospective implant studies with the FDA. *Id.* The concern is that the Debtor "will seek to implement a [study] protocol that advances its litigation goals" and that because of this the TCC needs equal access to the FDA. *Id.*

Even more galling to the TCC is the Debtor's alleged attempt to influence certain proposed legislation, enactment of which would have a detrimental effect on the claims of its constituency. The legislation of greatest concern to the TCC would apparently insulate companies that supply component parts or raw materials for use in implantable medical devices from any liability arising from harm caused by the implants if the injured person has not filed suit against the supplier prior to the effective date of the legislation. Presumably, the Debtor would argue that such a law would protect it from liability to persons who, while not having commenced suit against the Debtor, are nonetheless claiming injury from a silicone product which the Debtor supplied to other manufacturers. Such people, of course, would include the hundreds of thousands who were stayed from filing suit against the Debtor by the commencement of this bankruptcy case. Additionally, the enactment of other proposed legislation would apparently limit the potential liability of the Debtor in those cases where it manufactured the implant.

The Debtor admitted that it viewed the proposed legislation favorably but claimed "as a matter of policy, [to have] taken a hands off role with respect to specific legislation or specific language." Hearing Tr. at 19. However, for purposes of this decision, the Court assumes that the Debtor, which could potentially reap enormous benefits from the existence of such laws, has indeed made some sort of attempt to bring the legislation in question to fruition. Consequently, this opinion is premised on the assumption that, in addition to the administrative agency activities detailed above, the Debtor is in fact lobbying for legislation that will retroactively eliminate or restrict certain causes of action which some tort claimants might have against the Debtor.[2]

---

1. Section 330(a) of the Bankruptcy Code provides that a committee's professionals will be compensated for services that are actual and necessary. 11 U.S.C. § 330(a). And even though the TCC has asked for permission to lobby at the Debtor's expense, § 330(a) is not relevant to the Court's decision. The compensability of lobbying by a creditors' committee is secondary to the issue of whether such activity is even permissible. Thus, the real issue, as will be

discussed later, is whether lobbying is within the scope of § 1103(c).

2. Whether the Debtor should be able to spend estate funds on such activities is not in issue. *Cf. Committee of Asbestos–Related Litigants and/or Creditors v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 60 B.R. 612, 618–19, 14 B.C.D. 468, 14 C.B.C.2d 858 (Bankr.S.D.N.Y.1986) (Since, as is the case with most major corpora-

The Court has jurisdiction over this matter as provided by 28 U.S.C. §§ 1334 and 157(a). This contested matter is also a core proceeding. 28 U.S.C. § 157(b)(2)(A). Pursuant to F.R.Bankr.P. 7052, the Court's conclusions of law follow.

## OBJECTIONS

The Debtor and the Official Committee of Unsecured Creditors ("US/CC") lodged essentially the same objections to the Application. First, they asserted that the TCC's proposed lobbying activity is beyond the scope of 11 U.S.C. § 1103(c), which defines the role that Congress ·intended for an estate-compensated creditors' committee. Second, they claimed that the lobbying proposed by the TCC would only benefit certain segments of its constituency, and therefore conflicts with the fiduciary duties the TCC owes to its constituency as a whole. Finally, they alleged that forcing the Debtor to pay for the TCC's lobbying would violate the Debtor's First Amendment rights.

The constitutional objection goes like this. Corporations, like individuals, are entitled to First Amendment protection. *See e.g., Pacific Gas & Elec. v. Public Utilities Comm'n,* 475 U.S. 1, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) (compelling utility to disseminate views of ratepayers' group with which utility disagreed would violate its First Amendment rights); *cf.* 11 U.S.C. § 101(41) ("'person' includes ... corporation...."). Because the First Amendment protects freedom of expression and association (and conversely, the right not to express or associate), a person generally cannot be compelled to support the expression of another's views. *See Lehnert v. Ferris Faculty Ass'n,* 500 U.S. 507, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991) (service charges collected by union from non-union public employees as a condition of employment generally cannot be used in furtherance of political and ideological purposes with which the employee does not approve); *Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) (same); *see also Keller v. State Bar of California,* 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990); *Chicago Teachers Union v. Hudson,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986).

Other cases which seem to support the argument that compelling the Debtor to pay for the TCC's proposed lobbying would violate the Debtor's First Amendment rights include *Pacific Gas & Elec., supra* p. 898; *Hudgens v. NLRB,* 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976) (striking employees prohibited from picketing employer's retail store because it was located in a privately-owned shopping center); and *Lloyd Corp. v. Tanner,* 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972) (shopping center can prohibit anti-war activists from distributing literature on its property). These cases suggest that, regardless of the content or nature of the speech, one cannot be required to assist in the expression of views with which one does not agree.

The TCC counter-argued that the bar against requiring a person to financially or otherwise support expression with which the person objects is not absolute. Relevant Supreme Court cases have held that fees charged to an organization's members can be used to fund activity which is germane to the organization's stated purposes. For instance, in *Abood, supra,* the Court held that service charges could be used to advance the union's duties as collective bargaining agent of the employees. In *Keller, supra,* the Court held that the state bar association could not use membership dues to fund political and ideological activities unless those activities were undertaken for the purpose of regulating or improving the legal profession. When the fulfillment of an organization's stated duties require it to advance the interest of its members in legislative and other political arenas, then its members can be compelled to support such activity. *Lehnert,* 500 U.S. at 520, 111 S.Ct. at 1959–60. Therefore, the dividing line between the types of expression one can and cannot be compelled to support is not necessarily dependent upon whether the expression is political in nature. These cases, though not directly on point,

tions, the debtor had traditionally lobbied, it was within the ordinary course of business for it to continue doing so after filing bankruptcy.).

appear to lend credence to the TCC's argument that if the proposed lobbying is within the permissible scope of a creditors' committee's activities, engaging in such conduct at the expense of the Debtor would not violate the Debtor's First Amendment rights. But, on the other hand, the Debtor is not a member of the group whose goals the TCC's activities are intended to promote.

There are no cases applying First Amendment principles to a context similar to the one here and an attempt to do so raises many difficult questions. For example, if it is unconstitutional to compel a debtor to pay for a creditors' committee's legislative and administrative lobbying because the debtor disagrees with the content of the committee's speech, then how can it be constitutional to compel a debtor to pay for expression with which it disapproves when the speech occurs within the bankruptcy court? Why should speech in the legislative and executive arenas be uncompensated while similar speech in the judicial arena is compensated? The Debtor's response to this question was that by filing a voluntary petition for relief it bargained for the expenses which 11 U.S.C. § 330(a) imposes upon it. Query: What happens in an involuntary case? Does a debtor forced into bankruptcy have a constitutional right not to finance a committee's professionals?

On the other hand, if the constitutional issue were resolved in favor of the TCC, the Court would still have to decide whether the scope of an official committee's permissible activities encompasses lobbying.

■ These concerns bear out the wisdom of a basic rule of statutory construction. A court is obligated "to avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question." *Gomez v. United States,* 490 U.S. 858, 864, 109 S.Ct. 2237, 2241, 104 L.Ed.2d 923 (1989). Fortunately, there exists a plausible con-struction of § 1103(c) which obviates the need to resolve the very interesting constitutional issue.

## DISCUSSION

■ Section 1103(c) defines the actions that may be engaged in by a creditors' committee during the course of a bankruptcy case:

(c) A committee appointed under section 1102 of this title may—

(1) consult with the trustee or debtor in possession concerning the administration of the case;

(2) investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;

(3) participate in the formulation of a plan, advise those represented by such committee of such committee's determinations as to any plan formulated, and collect and file with the court acceptances or rejections of a plan;

(4) request the appointment of a trustee or examiner under section 1104 of this title; and

(5) perform such other services as are in the interest of those represented.

11 U.S.C. § 1103(c).

■ This section does not explicitly assign a creditors' committee the power to lobby. Not surprisingly, there are no cases which have addressed the issue. The only provision of this statute which arguably provides the TCC authority to engage in such activity, and the one most strongly relied upon by the TCC, is § 1103(c)(5). Read literally, this subsection appears to give a creditors' committee a broad grant of authority to do virtually anything that is "in the interest of" its constituents.[3] But this, like

---

**3.** The argument that § 1103(c)(5) should be read literally would be vulnerable to the well-known canon of statutory construction that "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another...." 2A *Sutherland Stat. Const.* § 46.06 (4th ed. Supp. 1991); *Pennsylvania Dep't of Public Welfare v. Davenport,* 495 U.S. 552, 562, 110 S.Ct. 2126, 2133, 109 L.Ed.2d 588 (1990) (Courts have expressed "a deep reluctance to interpret a statuto-

all laws, must be read in harmony with other provisions of the same enactment as well as non-bankruptcy law. So clearly a committee cannot point to § 1103(c)(5) to justify an action contrary to the Bankruptcy Code or other rule of law merely to advance its constituents' position. Therefore, even though courts have acknowledged that § 1103(c)(5) permits a committee to take an active role in many important matters within the bankruptcy case,[4] they have nonetheless placed limits on the scope of this provision.

For example, although a committee's powers extend to prosecuting lawsuits for the benefit of the estate,[5] exercise of that power is generally subject to these prerequisites: the committee can sue only upon demonstration that "(1) a colorable claim exists that the debtor has not pursued, (2) the committee made a demand upon the debtor to bring the action, and (3) the debtor unjustifiably refused to pursue the action following the demand." Kenneth N. Klee, K. John Shaffer "Creditors' Committees Under Chapter 11 of the Bankruptcy Code," 44 S.C.L.Rev. 995, 1044 (Summer, 1993).

And although it might be in the best interests of the estate to sell an asset, an official committee cannot usurp the power of management (trustee or debtor-in-possession) to make that choice. *In re Calvary Temple*

*Evangelistic Ass'n,* 47 B.R. 520, 12 B.C.D. 1143 (Bankr.D.Minn.1984).

In two important mass tort bankruptcy cases, the courts determined that an official committee's powers under § 1103(c)(5) did not extend to taking specified actions which were concededly in the interest of the committee's constituents. The point of distinction in both cases was that the activities were either taken or to be taken outside of the case itself.

In *In re Johns–Manville Corp.,* 52 B.R. 879, 13 B.C.D. 668, 13 C.B.C.2d 689 (Bankr. S.D.N.Y.1985), *aff'd* 60 B.R. 842 (S.D.N.Y.), *rev'd and remanded on other grounds,* 801 F.2d 60 (2d Cir.1986), the court explained that "[w]hile § 1103 contemplates a committee taking an active role in the proceedings, it does not grant a committee blanket authority to represent its constituency in matters outside and independent of the bankruptcy case." 52 B.R. at 884. Therefore, the court refused to approve the appointment of another law firm to specially represent the equity committee in state-court litigation to compel a shareholders' meeting.

In *In re Eagle–Picher Indus., Inc.,* 167 B.R. 102, 25 B.C.D. 884 (Bankr.S.D.Ohio 1994), the court reached a similar conclusion on facts close to ours. In that case, counsel for the equity committee sought compensa-

---

**4.** *Official Unsecured Creditors' Committee v. Stern (In re SPM Mfg. Corp.),* 984 F.2d 1305, 1315 (1st Cir.1993) (not contested that creditors' committee had authority, per § 1103(c)(5), to enter contract with secured creditor concerning further distribution of proceeds paid by estate to secured creditor); *Creditors' Committee v. Parks Jaggers Aerospace Co. (In re Parks Jaggers Aerospace Co.),* 129 B.R. 265, 267 (M.D.Fla.1991) (creditors' committee can have standing to act after confirmation of a chapter 11 plan but before its con-

ry provision so as to render superfluous other provisions in the same enactment."). If § 1103(c)(5) were interpreted as permitting an official committee to do anything that is "in the interest of" its constituency then § 1103(c)(1)–(4) would become unnecessary and meaningless— void, superfluous, inoperative, etc. Not surprisingly, the TCC did not advance such an argument. Instead it merely argued that within the limited scope of § 1103(c)(5) is the right to lobby Congress and regulators. Therefore, *that* is the issue, not whether § 1103(c)(5) has any limits at all.

summation); *In re Doctors' Hosp. of Tampa, Ltd.,* 183 B.R. 312, 314, 27 B.C.D. 545 (Bankr. M.D.Fla.1995) (same); *In re Diversified Capital Corp.,* 89 B.R. 826, 830, 19 C.B.C.2d 610 (Bankr. C.D.Cal.1988) (same); *In re Parrot Packing Co.,* 42 B.R. 323, 9 C.B.C.2d 877 (N.D.Ind.1983) (with debtor's consent, creditors' committee given standing to bring a motion to compel rejection of debtor's union contract); *In re Myers,* 168 B.R. 856, 862 (Bankr.D.Md.1994) (creditors' committee given standing to request "an extension of time for filing of complaints to determine nondischargeability").

**5.** *See e.g., Official Unsecured Creditors Committee of Sufolla, Inc. v. U.S. Nat'l Bank of Oregon (In re Sufolla, Inc.),* 2 F.3d 977, 979 n. 1 (9th Cir. 1993); *Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d 233, 247 (5th Cir.1988); *Unsecured Creditors Committee of Debtor STN Enter. Inc. v. Noyes (In re STN Enter.),* 779 F.2d 901, 904 (2d Cir.1985); *Tennessee Valley Steel Corp. v. B.T. Commercial Corp. (In re Tennessee Valley Steel Corp.),* 183 B.R. 795, 799–800, 34 C.B.C.2d 194 (Bankr.E.D.Tenn.1995).

tion for fees incurred in trying to prevent the New York Stock Exchange from delisting the debtor's stock. The court drew a "distinction ... between services which benefit shareholders, and services which benefit shareholders for which the bankruptcy estate should pay." 167 B.R. at 103. Even though the court recognized that keeping the debtor's stock listed on the exchange would benefit the constituents of the equity committee, it determined that the activity was independent of the bankruptcy case, was beyond the mandate of § 1103(c) and was therefore not compensable. *Id.* at 103–04.

The distinction between activity within and without the bankruptcy court was starkly demonstrated in *Official Committee of Equity Security Holders of Lone Star Indus., Inc. v. Lone Star Indus., Inc. (In re New York Trap Rock Corp.)*, 138 B.R. 420, 22 B.C.D. 1326 (Bankr.S.D.N.Y.1992). Following *Manville*'s statement that § 1103(c) "does not grant a committee blanket authority to represent its constituency in matters *outside* and independent of the bankruptcy case." 138 B.R. at 422, the court likewise prohibited an equity committee from prosecuting a case in state court seeking to compel the chapter 11 debtor to hold a shareholders' meeting. But the court then concluded that it had "authority to direct the debtor's officers and directors to comply with the corporate by-laws" and that "[c]learly, an official Equity Committee has standing as a party in interest to apply to the bankruptcy court for an order compelling the debtor's directors to

comply with the annual meeting mandated by the debtor's own by-laws." *Id.* at 423.[6] The court strongly reiterated the implication of its conclusion, by stating that:

> counsel for the Equity Committee is limited in their representation of the shareholders to the extent of participating in the adversary proceeding. In the event that the Equity Committee succeeds on the merits, and an annual meeting is directed, counsel for the Equity Committee may not be compensated for any services performed beyond the adversary proceeding in connection with the shareholders' meeting.

*Id.* at 423–24.

None of these cases enunciated a reason why activities outside and independent of a bankruptcy case fall outside the scope of § 1103(c)(5). But there is a well-settled canon of statutory construction which supports this conclusion. Under the rule of *ejusdem generis*, "where general words follow the enumeration of particular classes of things, the general words will be construed as applying only to things of the same general class as those enumerated." Black's Law Dictionary 517 (6th ed. 1990). *Norfolk and Western Ry. v. American Train Dispatchers Ass'n*, 499 U.S. 117, 129, 111 S.Ct. 1156, 1163–64, 113 L.Ed.2d 95 (1991); *Federal Maritime Comm'n v. Seatrain Lines, Inc.*, 411 U.S. 726, 733–34, 93 S.Ct. 1773, 1778–79, 36 L.Ed.2d 620 (1973); *Harris v. Richards Mfg. Co.*, 675 F.2d 811, 815 (6th Cir.1982); *Action Auto Stores, Inc. v. United Capitol*

---

**6.** The court also noted that three other courts had simply assumed that an official equity committee could bring a state court suit to compel a shareholders' meeting. *See In re Heck's, Inc.*, 112 B.R. 775 (Bankr.S.D.W.Va.1990); *In re Saxon Indus., Inc.*, 39 B.R. 49 (Bankr.S.D.N.Y.1984) (Ryan, J.); *In re Lionel Corp.*, 30 B.R. 327 (Bankr.S.D.N.Y.1983) (Ryan, J.). *Official Committee of Equity Security Holders of Lone Star Indus., Inc. v. Lone Star Indus., Inc. (In re New York Trap Rock Corp.)*, 138 B.R. 420, 22 B.C.D. 1326 (Bankr.S.D.N.Y.1992). However, in *Heck's*, the court held that the committee's lawsuit in state court was improper since only the bankruptcy court had jurisdiction to compel the debtor to hold a shareholders' meeting. Therefore, the request of the committee's counsel for compensation for services pertaining to the matter was denied. 112 B.R. at 798–801. This holding was overturned on appeal. *In re Heck's*

*Properties, Inc.*, 151 B.R. 739 (S.D.W.Va.1992). *See also, In re Johns–Manville Corp.*, 801 F.2d 60, 64 (2d Cir.1986). However, in none of these cases was the question of whether § 1103(c)(5) permits an official committee to engage in such conduct presented for decision. Because the legitimacy of such activity was not in issue, these cases are not authority for the proposition that official committees may litigate non-derivative actions in state court. *See* 1B *Moore's Federal Practice* ¶ 0.402[2], (2d ed. 1995) ("When an issue is not argued ..., the decision does not constitute a precedent to be followed in subsequent cases in which such an issue arises."); *see also, Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 113 (2d Cir.1988), *cert. denied*, 490 U.S. 1006, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989) (A sub silentio holding is "not binding precedent.").

*Ins. Co.*, 845 F.Supp. 428, 438 (W.D.Mich. 1993); *County Banking and Trust Co. v. Kapp (In re Kapp)*, 69 B.R. 652, 655–56 (D.Md.1987); 2A *Sutherland Stat. Const.* § 47.17 (4th ed. Supp.1991).

Paragraphs (1)–(4) of § 1103(c) have one thing in common: they all relate to activities taking place within the chapter 11 reorganization proceeding which spawned the committee. Paragraph (1) permits an official committee to consult with other parties about administration *of the chapter 11 case.* Paragraph (2) permits an official committee to investigate the debtor and its business and any other matter *relevant to the formulation of a plan in the case.* Paragraph (3) permits an official committee to participate in the formulation of *a plan of reorganization* of the debtor, which is an activity at the heart of the chapter 11 process. Paragraph (4) permits an official committee to seek to replace management with a trustee or to have an examiner appointed *under § 1104 of the Code* to assist it and others to do the investigation for which Paragraph (2) provides.

Each of these powers relates to actions which intimately involve the core of the reorganization process; and without the existence of a chapter 11 case, these powers would be meaningless. For instance, a group of creditors could not consult with a trustee or debtor in possession concerning the administration of the case if there were no chapter 11 case. If there were no reorganization case, creditors would not be empowered to investigate the debtor or its business or any other matter relevant to the case or to formulation of a plan. If there were no chapter 11 case, creditors could not be participating in the formulation of a chapter 11 plan. Nor could they seek the appointment of a trustee or examiner under § 1104.

Conversely, lobbying Congress and federal regulators is an activity which can be, and almost exclusively is, accomplished outside of the peculiar reality of a bankruptcy case.

Therefore, a reasonable construction of § 1103(c)(5) is that a committee can perform such other services *within the bankruptcy case* as are in the interest of those represented. For example, § 1103(c) does not in so many words authorize a committee to make a motion to dismiss the case or to convert the case to chapter 7. Nor does it say that a committee may oppose a cash collateral agreement, or for that matter, any motion brought under § 362, § 363, § 364 or § 365. But these must be the kinds of "other services" that § 1103(c)(5) contemplates.[7]

## CONCLUSION

While the limits of § 1103(c)(5) are not precisely defined, there is a clear line of separation between the ability of a creditors' committee to act within the bankruptcy case and the ability to act independent of and outside the case. And this line of separation is reasonable.

First, this interpretation is consistent with analogous case authority on § 1103(c)(5). Second, it comports with accepted rules of statutory interpretation by avoiding potential conflicts between the Bankruptcy Code and

---

**7.** Situations where a court permitted a creditors' committee to act on its own behalf, that is, not derivatively, were primarily restricted to activity taking place within the bankruptcy forum (i.e. continuing to function after confirmation of a plan and requesting extension of the bar date). *See* n. 4 *supra.* Other than the shareholders' meetings cases where the appropriateness of the committees' activities were not in issue, *see* n. 6, the only apparent exception to this was *SPM Mfg., supra,* n. 4, where the court reversed a lower court order compelling a secured creditor to pay over to the chapter 7 trustee money it had agreed to pay general unsecured creditors as part of a contract entered during the pendency of the debtor's chapter 11 reorganization. Although the lower court asserted various rationales for its ruling, it never claimed that entering a contract with another party in the case was outside the committee's statutory powers, and neither did the appellees on appeal. 984 F.2d at 1315. Therefore, the case is weak authority to begin with. Furthermore, the contract's mutual promises were all related to activities within the bankruptcy case itself and even the term in question involved nothing other than an agreement on further allocation of a disbursement made by the bankruptcy estate. Negotiated agreements between parties in interest that resolve issues pending before the bankruptcy court are, in essence, activities taking place within the bankruptcy forum. Since the law favors settlement, *see, e.g., In re Dow Corning Corp.,* 192 B.R. 415, 421 (Bankr.E.D.Mich.1996), it is appropriate for parties in interest to enter into agreements that foster the resolution of a case and are not otherwise improper, illegal or contrary to the Bankruptcy Code.

the Constitution. And third, the interpretation reflects the fact that an official creditors' committee is a creature of bankruptcy law; it is created solely for the purpose of facilitating the bankruptcy process and absent a debtor filing for bankruptcy protection, an official creditors' committee would · never come into existence. Consequently, activities like lobbying Congress or administrative agencies, which are independent of the bankruptcy case, are beyond the mandate of § 1103(c)(5). Because lobbying is beyond the power of an official committee, the remaining issues—whether such activity would either violate the Debtor's First Amendment rights or violate the TCC's fiduciary duties to some of its constituents—need not be addressed.

Finally, this decision does not mean that the TCC is left without the ability to protect the interests of its constituency. An official committee has statutory authority to "investigate the acts ... [and] conduct ... of the debtor, the operation of the debtor's business and ... any other matter relevant to the case...." 11 U.S.C. § 1103(c)(2). The TCC may therefore monitor the Debtor's lobbying activity in the manner it deems most appropriate. It may then report its findings and suggestions to constituents. Armed with this information, the TCC's members and/or constituents can approach Congress or administrative agencies, at their own expense, to present their side(s) of the story. As such, this Opinion does not in any way detract from the First Amendment rights of a claimant to seek redress from the government for his or her grievances. But such activity must be private and not a part of the bankruptcy process.

For these reasons, an order denying the application shall be entered.