**In re John August ENGMAN, Debtor.**

**No. HG 01–13070.**

United States Bankruptcy Court,
W.D. Michigan.

Sept. 23, 2005.

John August Engman, Esq., Grand Rapids, MI, appearing Pro Se.

Jonathan F. Thoits, Esq., Grand Rapids, MI, for Thomas A. Bruinsma, Chapter 7 Trustee.

## OPINION RE: TRUSTEE'S JUNE 18, 2004 MOTION TO DISTRIBUTE PROCEEDS TO SUN–DA–GO CONDOMINIUM ASSOCIATION

JEFFREY R. HUGHES, Bankruptcy Judge.

Thomas A. Bruinsma, the Chapter 7 trustee ("Trustee"), has requested an order from this court with respect to his proposal to distribute to the Sun–Da–Go condominium association proceeds from the sale of condominium lots. John A. Engman, the debtor, objected to the proposed distribution. I interpret Trustee's motion as in fact a request for court approval of the underlying settlement Trustee reached with the condominium association concerning its claimed liens in the condominium lots. I deny that request for the reasons stated in this opinion.

### I. PROCEDURAL BACKGROUND

Mr. Engman filed a petition for relief under Chapter 7 of the Bankruptcy Code on December 28, 2001. Mr. Engman converted his case to a Chapter 13 proceeding shortly thereafter. Both the United States Trustee ("UST") and the Chapter 7 Trustee at one time or another opposed the conversion of the case to Chapter 13 and otherwise sought to have it reconverted to a Chapter 7 proceeding.[1] However, Mr. Engman eventually volunteered to reconvert his case to Chapter 7 on October 7,

---

1. I originally permitted Mr. Engman to convert his case to a Chapter 13 proceeding but I also immediately granted the UST's and the Trustee's motion to re-convert the case to a Chapter 7. The district court reversed my order re-converting the case to a Chapter 7 proceeding on March 27, 2003 and remanded the matter for further consideration. However, Mr. Engman voluntarily re-converted his Chapter 13 proceeding to a Chapter 7 proceeding on the day further evidence was to be submitted pursuant to the remand.

2003 and his case has since been administered as a Chapter 7 proceeding.

Mr. Engman owned at the time of his bankruptcy petition undivided interests in a number of lots in a condominium project in Caledonia, Michigan (the "Sun–Da–Go condominium project"). On February 26, 2004, Trustee filed a motion to authorize the sale of both the bankruptcy estate's and the co-owners' interests in some of these lots. The motions also sought court approval of the Trustee's proposal to distribute to the Sun–Da–Go condominium association from the sale proceeds $11,226.98 per lot for "back dues and assessments." [2] Mr. Engman objected to this proposed distribution as well as other aspects of the contemplated sales.

A hearing was held on March 18, 2004. I authorized the sales at that time. However, I denied without prejudice the Trustee's request concerning the proposed disbursements. Although the Trustee was directed to prepare proposed orders consistent with my March 18, 2004 ruling, he did not do so. Instead, the Trustee filed a separate motion on June 18, 2004 in which he again sought court approval for proposed disbursements from the anticipated sale proceeds, including the proposed $11,226.98 per lot disbursement to the Sun–Da–Go condominium association. The Trustee also filed during this time a motion to approve the sale of another lot in the condominium project. That motion also proposed an $11,226.98 distribution to the Sun–Da–Go condominium association as reimbursement for uncollected dues and assessments.

Trustee's motion to sell this additional lot and his June 18, 2004 motion to ap-

prove the proposed disbursements with respect to the other lots were heard on July 9, 2004. I authorized Trustee's sale of the additional lot but I again declined to approve the proposed distribution to the Sun–Da–Go condominium association. I instead scheduled an August 12, 2004 status conference to discuss the dispute between the Trustee and Mr. Engman concerning the proposed distributions to the Sun–Da–Go condominium association.[3]

Trustee did finally submit on August 10, 2004 proposed orders concerning the lot sales authorized at the March 15, 2004 hearing. I signed those orders on August 12, 2004. I had also previously signed on July 27, 2004 the order concerning the lot sale authorized at the July 9, 2004 hearing. Each of these orders stated that the Trustee had the authority to make all of the distributions proposed in his various motions, including the proposed $11,226.98 per lot distribution to the Sun–Da–Go condominium association. However, neither order disposed of Mr. Engman's objection. Rather, each provided that Mr. Engman reserved the right, at his election, to later challenge the Trustee's decision in conjunction with the Trustee's overall administration of the bankruptcy estate.

The status conference concerning Mr. Engman's objection to Trustee's proposed distribution to the Sun–Da–Go condominium association was held as scheduled and I issued a memorandum opinion and scheduling order concerning the same. I determined in that opinion that the Trustee did not require authority from the court to make the proposed distributions to the Sun–Da–Go condominium project or to reach the settlement he did with the

**2.** See, ¶ 11.b., Trustee's 2/26/04 motions and prayers for relief.

**3.** Mr. Engman and the Trustee had agreed by the August 12, 2004 hearing that the Trustee could pay all of the proposed disbursements from the anticipated sale proceeds with the exception of the proposed disbursement to the Sun–Da–Go condominium association.

Sun–Da–Go condominium association. However, I also determined that the Trustee did have the prerogative under Fed. R.Bankr.P. 9019(a) to seek court approval of that settlement. Therefore, I concluded that the motion the Trustee had styled as a request for authority to make proposed disbursements to the condominium association was in fact a motion by the Trustee to procure Rule 9019(a) approval of the underlying settlement he had reached with the condominium association. The scheduling order then established the process whereby the Trustee's Rule 9019(a) motion would be adjudicated.

The Rule 9019(a) motion culminated in a three and a half day evidentiary hearing. Mr. Engman called three witnesses. Two of the witnesses were attorneys who had represented Mr. Engman at one time or another in connection with the Sun–Da–Go condominium project. Mr. Engman himself was the third witness. All of Mr. Engman's 49 proffered exhibits were admitted.[4]

Trustee also called three witnesses. One witness was Mr. Engman's daughter. The other two witnesses were the Trustee himself and Larry A. Ver Merris, the attorney who had represented the Trustee in connection with reaching the Sun–Da–Go condominium association settlement. All of the Trustee's 10 proffered exhibits were also admitted.

I took the matter under advisement after the parties completed their proofs and made their closing arguments.[5]

## II.  FACTUAL BACKGROUND

Mr. Engman is an attorney. Mr. Engman, along with his former wife, also co-developed the Sun–Da–Go condominium project. The condominium project currently consists of 18 large lots located in a scenic wooded tract along the Thomapple River. The project includes common areas and room for the development of 7 additional lots.

The Sun–Da–Go condominium association and Mr. Engman began crossing swords in 1997. Mr. Engman was also in the midst of a bitter divorce at that time. Indeed, the state court judge presiding over the divorce proceeding had appointed Robert Schellenberg as a receiver to replace Mr. and Mrs. Engman as the developers of the Sun–Da–Go condominium project.

Mr. Schellenberg had a meeting on February 9, 1997 with the nine owners who had purchased lots in the Sun–Da–Go development. He indicated at this meeting that there were enough non-developer lot owners to organize the condominium association contemplated in the master deed.[6]

---

4. Trustee moved at the close of Mr. Engman's proofs for judgment in his favor based upon the argument that Mr. Engman's own proofs were insufficient to establish that the Trustee had not exercised good business judgment even when those proofs were interpreted in the light most favorable to Mr. Engman. I deferred considering that motion until Trustee had submitted his proofs. The propriety of the Trustee's request is questionable given that there is no bankruptcy rule comparable to Fed.R.Civ.P. 50. In any event, I now conclude that Mr. Engman's proofs were sufficient to warrant proceeding with trial beyond that point.

5. The final pretrial order limited each of the parties' trial time to seven hours. Mr. Engman was given additional time to cross-examine Mr. Ver Merris because Mr. Ver Merris had not been disclosed as a witness in the Trustee's witness list. Both of the parties completed their trial presentations within the allotted time.

6. *See,* 2/11/97 letter from condominium property owners to Mr. Schellenberg included within Engman Ex. 20.

However, Mr. Schellenberg had already filed articles of incorporation for the Sun–Da–Go condominium association on December 17, 1996 and he had identified himself as the sole director of the Sun–Da–Go condominium association in those articles of incorporation. Therefore, what Mr. Schellenberg was actually suggesting to the non-developer lot owners was that they assume control of the already existing Sun–Da–Go condominium association. The lot owners acted on Mr. Schellenberg's suggestion by shortly thereafter replacing him as sole director with a new board of directors consisting entirely of non-developer lot owners.[7]

The non-developer lot owners accomplished this change at a meeting held on May 1, 1997. The minutes of the May 1, 1997 meeting also indicate that the association set the condominium dues for the 1997–98 fiscal year at $300 per lot. The association then billed Mr. Engman for $1,350 for the FY 98 dues.[8] This amount represented one-half of the $2,700 assessed for the nine unsold lots in the condominium in which Mr. Engman had an undivided interest. The association billed Mr. Engman's former wife for the other half.[9]

Mr. Engman did not pay these dues despite the condominium association's repeated demands. Consequently, Thomas Kribs, the association's treasurer, filed in May of 1998 a small claims action in state court to recover the dues. This action was still pending when Mr. Engman filed his bankruptcy petition in December of 2001. During the course of this litigation, the state district court twice entered a judgment against Mr. Engman and the state circuit court twice reversed the state district court's decision and remanded it for further consideration.[10]

The second state district court judgment, which was signed on January 4, 2000, provided for the recovery of $4,500 in unpaid "assessments from 1997–1999."[11] The record indicates that the condominium association had again assessed dues of $350 per lot for both FY 99 and FY 00 and that it had billed Mr. Engman $3,150 for his one-half interest in the 9 unsold lots.

The association continued to assess dues for annual periods beyond FY 00 and to charge Mr. Engman, and then his bankruptcy estate, for his share of these dues. The record indicates that the amounts assessed against him or his bankruptcy es-

7. *See,* 6/17/99 letter from Judy Beasley to Donna Cole and 5/19/97 minutes of first annual association meeting. Both documents are part of Engman Ex. 20.

8. Art. V.3. of the association bylaws provides that the monthly condominium dues are to be paid in advance. Therefore, the dues approved at the May 1, 1997 meeting were for the fiscal year ending April 30, 1998. Various exhibits nonetheless refer to these dues as the 1997 dues and the next year's dues as the 1998 dues, etc. However, I refer to the dues for the period May 1, 1997 to April 30, 1998 as the dues for FY 98 and the dues for the period May 1, 1998 to April 30, 1999 as the dues for FY 99, etc.

9. It appears from the record that Mr. Schellenberg's appointment as a receiver ended

sometime in May or June of 1997, although there was testimony that the actual order terminating his receivership was not signed and entered until several years later. In any event, it appears from the record that Mr. Schellenberg's involvement in the Sun–Da–Go condominium project ceased shortly after the condominium association had its first meeting in May 1997.

10. A Michigan district court has only limited jurisdiction. Decisions by the district court are subject to appellate review by the circuit court, which is also Michigan's court of general jurisdiction.

11. The second state district court judgment is an attachment to the 1/29/04 letter from Curtis Rypma to Larry Ver Merris. Engman Ex. 14.

tate for FY 01 through FY 04 is $9,450. The record also indicates that the condominium association billed him $765 for a special assessment in FY 00 and $1,125 for a special assessment in FY 02.

The Sun–Da–Go condominium association contends that all of these dues and special assessments remain unpaid. It further contends that it is owed interest in connection with these unpaid dues and assessments. The amount claimed for all unpaid dues and assessments, including interest, as of January 26, 2004 was $22,842.10.[12]

The bylaws of the Sun–Da–Go condominium association permit the association to recover costs and actual attorneys fees incurred in connection with the collection of unpaid dues and assessments owed by an owner of a lot.[13] The condominium association contends that Mr. Engman or his bankruptcy estate owes $30,567 in attorneys fees and $647.84 in out-of-pocket expenses incurred in the attempted collection of the unpaid dues and assessments.[14]

The Sun–Da–Go condominium association also asserts that Mr. Engman and his former wife, as co-developers of the condominium project, did not complete the project. It described the uncompleted work as "asphalt, road work, dock and boat launch."[15] The condominium association asserts that the cost to complete these items is $31,180. However, this amount is not based upon the association's own costs incurred. Rather, it is based upon a January 29, 2004 proposal from a paving company.[16]

The Sun–Da–Go condominium association claims against Mr. Engman or his bankruptcy estate are summarized as follows:

| | |
|---|---|
| Unpaid Dues | $13,950.00 |
| Unpaid Special Assessments | $ 1,890.00 |
| Interest on Dues and Special Assessments | $ 4,702.10 |
| Attorneys Fees | $30,567.00 |
| Out-of-Pocket Expenses | $ 647.84 |
| Damages for Failure to Complete Project | $31,180.00 |
| | |
| TOTAL | $82,936.94 |

In addition, the Sun–Da–Go condominium association asserts that Mr. Engman's former wife, and now his daughters, Stephanie Scruggs and Sari Jousma,[17] owe it $18,105.86 for unpaid dues and assessments on account of the other undivided half interest in the unsold lots. This amount, coupled with the amount claimed against Mr. Engman, totals $101,042.80 and it is this total which, when divided by nine, results in the $11,226.98 the Trustee proposes to pay the Sun–Da–Go condominium association from the sale proceeds of the nine remaining lots.[18]

12. See, 1/29/04 letter from Curtis Rypma to Larry Ver Merris and attachments. Engman Ex. 14.

13. Art. V.4., Association Bylaws. Engman Ex. 10.

14. See, 1/29/04 letter from Curtis Rypma to Larry Ver Merris and attachments. Engman Ex. 14. See, also, 2/16/04 letter from Curtis Rypma to Larry Ver Merris. Engman Ex. 32.

15. See, 1/29/04 letter from Curtis Rypma to Larry Ver Merris and attachments. Engman Ex. 14.

16. See, 1/29/04 letter from Curtis Rypma to Larry Ver Merris and attachments. Engman Ex. 14.

17. Mr. Engman's former wife passed away after Mr. Engman filed his bankruptcy petition. Ms. Scruggs and Ms. Jousma claim to have inherited their mother's one-half interest in the nine unsold lots.

18. The Sun–Da–Go condominium association has since asserted that the $11,226.98 per lot amount must be increased to reflect another $2,700 for dues assessed for FY 2005 and for attorneys fees incurred since February 16, 2004. See, August 9, 2004 letter from Curtis Rypma to Larry Ver Merris, Engman Ex. 37. The amount also has presumably increased due to the accrual of interest since January 26, 2004. It is unclear whether the agreement the Trustee has reached with the Sun–

The bylaws of the Sun–Da–Go condominium association also provide that:

> Each Co-owner shall be obligated to pay all assessments levied on the Co-owner's Lot while the Co-owner owns the Lot. No Co-owner may be exempted from liability from the Co-owner's contribution toward the administration expenses by a waiver of the use or enjoyment of any of the Common Elements or by the abandonment of the Co-owner's Lot. If any Co-owner defaults in paying the assessed charges, the Board may impose reasonable fine or charge interest at the legal rate on the assessment from the date it is due. **Unpaid assessments shall constitute a lien on the Lot that has priority over all other liens except state or federal tax liens and sums unpaid on the first mortgage or record recorded before any notice of lien by the Association.**[19] (Emphasis added).

The lien rights afforded by this section of the bylaws are consistent with the rights granted to condominium associations by statute.

> Sec. 108. (1) Sums assessed to a co-owner by the association of co-owners that are unpaid together with interest on such sums, collection and late charges, advances made by the association of co-owners for taxes or other liens to protect its lien, attorney fees, and fines in accordance with the condominium documents, constitute a lien upon the unit or units in the project owned by the co-owner at the time of the assessment before other liens except tax liens on the condominium unit in favor of any state or federal taxing authority and sums unpaid on a first mortgage of record, except that past due assessments that are evidenced by a notice of lien recorded as set forth in subsection (3) have priority over a first mortgage recorded subsequent to the recording of the notice of lien.

MICH. COMP. LAWS § 559.208(1).

The Sun–Da–Go condominium association relies both upon its bylaws and MICH. COMP. LAWS § 559.208(1) to assert that the entire $11,226.98 per lot constitutes a lien against that lot which must be paid from the proceeds realized by the Trustee from its sale. Indeed, the Sun–Da–Go condominium association has filed at least six different liens against the nine lots in which the bankruptcy estate holds an undivided interest.[20]

Mr. Engman contends that the condominium association is not legally entitled to what it claims as due. He argues, among other things, that the association does not have the authority to make the claim that it has, that it has not properly assessed the dues claimed and that it otherwise has not justified the amount asserted is owed by Mr. Engman and his bankruptcy estate.[21]

---

Da–Go condominium association contemplates the per lot distribution to be made to the association being increased for these additional amounts or whether the Trustee will contend that the condominium association is bound by the agreement to accept $11,226.98 per lot in full satisfaction of all its claims.

**19.** Art. V.4. Association Bylaws. Engman Ex. 10.

**20.** *See, e.g.,* Engman Ex. 17 and 18.

**21.** Mr. Engman's other objections cover a broad range. For example, Mr. Engman complains that the Trustee has not pursued a valuable RICO claim against Mr. Schellenberg, the state court receiver, and his attorney and that he has not pursued an alleged misappropriation by Carol Houkes, Mr. Engman's sister, of monies that he stood to inherit from his father. Mr. Engman also asserts that Trustee has not properly performed his role as a co-developer of the Sun–Da–Go condominium project by, among other things, failing to address some lot line issues before

In fact, Mr. Engman contends that nothing is owed to the Sun–Da–Go condominium association.

The Trustee acknowledges that his settlement with the Sun–Da–Go condominium association contemplates paying the condominium association exactly what it claims it is owed per lot. The Trustee justifies his decision in part based upon his own assessment of the validity of the condominium association's claimed liens. The Trustee also asserts that there are other factors that warrant his decision to settle with the Sun–Da–Go condominium association as he did. These other factors are:

- The condominium association's purported agreement to assume responsibility for whatever work remained in connection with completing the condominium project.
- The advantage of procuring a consensual release of the condominium association's liens against the lots over relying upon this court's Section 363(f) order[22] directing the lots to be sold free and clear of the condominium association's liens;
- The unwillingness of Mr. Engman's daughters to contest what the condominium association claimed was owed by them as the owners of their deceased mother's separate undivided interest in the nine lots; and
- The fact that the bankruptcy estate would have to account to the condominium association for the amounts it claimed as due regardless of whether its lien was honored if the bankruptcy estate is in fact solvent.

### III. DISCUSSION

I determined in *In re Dalen*, 259 B.R. 586 (Bankr.W.D.Mich.2001), that the proceeding with the sale of the remaining lots. However, the question before me in this instance is not whether Trustee has properly managed the bankruptcy estate but whether the particular settlement he has reached with the Sun–Da–Go condominium association regarding its claimed liens should be approved so that at least this one aspect of Trustee's administration of the bankruptcy estate will not be later challenged by Mr. Engman as an example of Trustee's alleged mismanagement.

Mr. Engman also claims that the bankruptcy estate, as his successor-in-interest, has a $200,000 claim against the Sun–Da–Go condominium association. The Trustee correctly points out that his agreement with the Sun–Da–Go condominium association does not include a settlement of this alleged claim. However, the Trustee's contention that the claim against the condominium association should simply be ignored is not correct. The purported claim also constitutes a possible setoff against the condominium association and therefore it is relevant in evaluating Trustee's decision to settle the condominium association's asserted liens against the unsold lots. With this said, Mr. Engman offered very little at trial to support his contention that the bankruptcy estate had a material right of setoff against the condominium association. Moreover, even if I were to conclude that the alleged setoff was significant, it would only serve as additional support for my conclusion that the settlement the Trustee has reached with the condominium association should not be approved.

Mr. Engman also asserts that the condominium association is barred by *res judicata* from pursuing a significant portion of its lien claim. Mr. Engman based this argument upon the state district court action. However, the state district court action was still pending when Mr. Engman filed his bankruptcy petition and the automatic stay has prevented that matter from proceeding since then.

22. Each of the orders authorizing Trustee's sale of the seven lots includes an additional provision that directs the subject lot(s) to be sold free and clear of Sun–Da–Go condominium association's lien. This provision was included pursuant to 11 U.S.C. § 363(f). Mr. Ver Merris, the Trustee's attorney, testified that some title companies in the area have refused to "insure over" on recorded liens notwithstanding such an order and therefore it was still desirable to obtain a consensual release from lienholders.

settlement approval process permitted by Fed.R.Bankr.P. 9019(a) is discretionary, not mandatory. *Id.* at 598–99. I further determined in *Dalen* that the purpose of the Rule 9019(a) procedure is to provide the trustee with a mechanism to judicially validate his decision to settle at the time of the settlement so as to avoid a subsequent challenge to that decision in the context of an objection to the trustee's fees or a claim against the trustee's bond.

> A trustee's decision to settle an estate claim is more akin to decisions for which court approval is not permitted than to decisions for which court approval is mandatory. As already discussed, nothing obligates the trustee to seek court approval of a proposed settlement. It is discretionary. If the trustee were to forgo court approval and if a creditor were to challenge the trustee's decision to settle at some later date (*e.g.*, through an objection to fees), the court would evaluate that decision in the same manner as it would for any other trustee decision for which prior court approval was not permitted. That is, the court would determine whether the challenge has merit based upon the standard of what an ordinarily prudent person might do. *Ford Motor Credit Company v. Weaver*, 680 F.2d at 461–62.

> In reality, Rule 9019(a) is nothing more than a free pass for the trustee to secure declaratory relief regarding her person-

al exposure with respect to compromises and settlements made by her on behalf of the estate. The issue is the same whether she seeks validation of her decision prior to consummating the settlement through this declaratory process or waits until a creditor challenges her decision to secure vindication.

*Id.* at 603–04.

The Trustee's Rule 9019(a) request in this instance reaffirms these conclusions. My orders concerning the Trustee's sale of the various lots are quite clear with respect to his proposed distribution to the Sun–Da–Go condominium association on account of its claimed liens. The Trustee has the authority to make the distributions as proposed. However, if the Trustee elected to exercise that authority without also seeking approval of the settlement he had struck with the condominium association, he would do so at the risk of Mr. Engman later challenging his decision when, for example, the Trustee sought approval of his fees. Indeed, Mr. Ver Merris, the Trustee's attorney, agreed in his testimony that the Trustee's only purpose in seeking approval of the proposed distribution to the Sun–Da–Go condominium association was to protect the Trustee and the bankruptcy estate from the adverse consequences of this court later determining that the Trustee's decision was ill-advised.[23]

---

**23.** The Trustee's election to seek approval of his settlement over Mr. Engman's objection does, under the circumstances, beg the question as to the wisdom of that strategy. The court devoted nearly 14 hours of its time hearing testimony and argument and both parties spent considerable time preparing for the hearing. However, the Trustee's justification for this endeavor rested ultimately on nothing more than the Trustee's desire for protection against the possibility that this court at some later date might "per chance" determine that his decision was not "proper" (5/10/05 Tr., pp. 32–33). An alternative ap-

proach would have been to proceed with the settlement without approval with the understanding that Mr. Engman's objection might be raised again when, for example, the Trustee sought approval for his compensation. At worst, the Trustee would have had to defend at that time the decision he has so vigorously defended now. Moreover, the Trustee might have also enjoyed the additional defense of standing had he chosen to defer litigating this issue. Mr. Engman is the debtor in this Chapter 7 proceeding. Consequently, his standing to object to the Trustee's decision is

The Trustee's request also reaffirms the method I have adopted for determining whether a settlement submitted by a bankruptcy trustee under Rule 9019(a) should be approved. As discussed in *Dalen*, "fair and equitable" and "best interests of the estate" are the catch phrases frequently used by courts to distinguish settlements that are to be approved from those that are not to be approved. However, neither of these phrases, in and of itself, offers much guidance as to exactly what the court is to consider in response to a Rule 9019(a) request.[24] Consequently, the courts, as is their wont, have over time developed checklists to give meaning to these phrases.

One frequently cited checklist is enumerated in *Drexel v. Loomis*, 35 F.2d 800, 806 (8th Cir.1929):

(1) the probability of success in the litigation;

(2) the difficulties of collecting any litigated judgments;

(3) the complexity of the litigation and the expense, inconvenience and delay necessarily attending it; and

(4) the interests of the creditors and interest holders of the estate.

See, e.g., *In re Jackson Brewing Co.*, 624 F.2d 605, 607 (5th Cir.1980); *In re W.T. Grant Co.*, 4 B.R. 53, 69 (Bankr.S.D.N.Y. 1980); *In re Meyer*, 105 B.R. 920, 923–927 (Bankr.D.Minn.1989).

Another more expansive checklist is set forth in *In re Texaco, Inc.*, 84 B.R. 893, 902 (Bankr.S.D.N.Y.1988):

(1) the probability of success in litigation in comparison to the present and future benefits offered by the settlement.

(2) the prospect of complex and protracted litigation if the settlement is not approved;

(3) the degree to which the settlement is supported by parties in interest;

(4) the competency and experience of counsel who support the settlement;

(5) the relative benefits to be received by members of any affected class;

(6) the nature and breadth of releases to be obtained by officers and directors; and

(7) the extent to which settlement is the product of arms length bargaining.

See, e.g., *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 758 (Bankr. S.D.N.Y.1992); *In re Dow Corning Corp.*,

---

premised upon the estate being solvent. At this juncture, the Trustee believes that the estate is in fact solvent. However, his confidence is not 100%. Indeed, Mr. Ver Merris' current assessment is that the probability of Mr. Engman receiving a Section 726(a)(6) distribution is only 50%. Consequently, there is a reasonable likelihood that Mr. Engman's views concerning the propriety of the Trustee's decision to settle with the condominium association would have been rendered moot had the Trustee elected not to seek approval of the settlement at this time.

**24.** Indeed, it is questionable whether "fair and equitable" is even an appropriate catch phrase. *See, In re Dalen*, 259 B.R. at 599–601. The history of that phrase traces back to the Supreme Court case of *Protective Commit-*

tee for Independent Stockholders of TMT Ferry, Inc. v. Anderson, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968). The court in *Anderson* referred to "fair and equitable" in the context of whether a settlement reached with secured creditors violated the confirmation requirement that a Chapter X plan be "fair and equitable" because the settlement involved a distribution of substantial equity interests to those creditors to the detriment of the existing equity holders. The Court in *Anderson* made no reference whatsoever to Section 27 of the former Bankruptcy Act, which is the predecessor to Rule 9019(a). Nonetheless, court after court has cited *Anderson* as authority for the proposition that settlements must be "fair and equitable" in order to be approved pursuant to Rule 9019(a).

192 B.R. 415, 421–22 (Bankr.E.D.Mich. 1996).

However, such checklists are as meaningless as "fair and equitable" and "best interests of the estate" unless there is a framework within which the checklists are to be applied. For example, it is difficult to give the appropriate weight to the competency and experience of counsel or the prospect of complex and protracted litigation unless one first knows why consideration of these two factors is important to the Rule 9019(a) approval process.

■ I concluded in *Dalen* that it is the trustee's performance as a fiduciary of the bankruptcy estate that is the context within which these and other relevant factors must be considered.[25] In other words, the ultimate objective of the Rule 9019(a) approval process is to procure from the court a declaration that the trustee, in arriving at the settlement proposed, has properly exercised the duties imposed upon him as a fiduciary of the bankruptcy estate. These duties are the duties of obedience, loyalty, and care. *Dalen,* at 610–615.

I had determined before the commencement of the evidentiary hearing that the Trustee, in reaching the settlement with the Sun–Da–Go condominium association, had not violated either his duty of loyalty (*i.e.,* the obligation to act in the estate's interest, as opposed to the Trustee's own interest) or his duty of obedience (*i.e.,* the obligation to act lawfully and within the Trustee's permitted authority). Consequently, the only issue left to be decided when the evidentiary hearing commenced was whether the Trustee's decision was consistent with his duty of care.

■ The duty of obedience establishes the scope of a fiduciary's activities. The duty of care in turn proscribes how the fiduciary engages in those activities. Put simply, the fiduciary is expected to conduct his or her activities on behalf of the estate in a "non-negligent" fashion. In the context of business activities, this responsibility is often expressed as the business judgment rule.

The business judgment rule is best described as a standard or presumption against which a director's conduct is to be judged. Generally, the rule protects a disinterested director from liability with respect to any business decision on behalf of the corporation which was made "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of

---

**25.** Another approach would be for the court to focus upon the settlement itself as opposed to the trustee's performance. For example, the court would consider the competency and experience of counsel and the prospect of complex and protracted litigation not in the context of whether the trustee himself has exercised good judgment in reaching the contemplated settlement but rather in the context of whether the court itself believes the settlement is in the best interests of the estate. In other words, the court would supplant its own judgment for that of the trustee under this alternate approach.

However, one of the fundamental changes accomplished by the Bankruptcy Code was the removal of the bankruptcy judge from the day-to-day administration of the bankruptcy estate. *Dalen,* 259 B.R. at 596–97. In most instances it is the trustee, not the bankruptcy judge, who is to decide what is in the best interests of the estate's constituents. The bankruptcy court is to intervene only when the trustee's decision is properly brought before it as an issue and then only in the context of whether the trustee has exercised good judgment or not. Were it otherwise, that is, were it Congress' purpose to have the bankruptcy courts regularly intervene to in effect "quality control" the trustee's settlement decisions, then Congress would have made court approval of settlements mandatory in the same manner as it has made court authorization of out-of-the-ordinary course sales of estate assets mandatory. 11 U.S.C. § 363(b).

the company." *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984) (*overruled on other grounds by Brehm v. Eisner,* 746 A.2d 244 (Del.2000)).

> [D]irectors' decisions will be respected by courts unless the directors are interested or lack independence relative to the decision, do not act in good faith, act in a manner that cannot be attributed to a rational business purpose or reach their decision by a grossly negligent process that includes the failure to consider all material facts reasonably available. *Brehm,* 746 A.2d at 264 n. 66.

*In re Dalen,* 259 B.R. 586, 610.

■ Indeed, the business judgment rule creates a presumption in favor of the fiduciary. In other words, a disinterested fiduciary is not required to prove that he or she did not act negligently. Rather, it is the party challenging the fiduciary's decision who must establish that the course of action chosen by the fiduciary was outside the parameters of what a rational and reasonably informed business person might select.

■ The Trustee in this instance asserts that he has exercised good business judgment in his agreement to pay the Sun–Da–Go condominium association $11,226.98 per lot on account of its purported liens against the remaining nine unsold lots of the development. It is Mr. Engman's contention, and his burden, to establish that the Trustee's decision lacked a rational purpose or that the decision was otherwise irrationally conceived.

A. *Evaluation of the Condominium Association's Liens and Supporting Claims.*

Mr. Engman's objection is premised upon the assumption that there is no indebtedness owing by him or the bankruptcy estate to support the Sun–Da–Go condominium association's liens against the nine unsold lots. An assessment of the condominium association's claim is therefore appropriate, especially in light of the Trustee's decision to pay that claim in full in lieu of negotiating a reduced amount.

1. *Validity of the Condominium Association's Liens.*

Mr. Engman himself has not argued that the liens claimed by the Sun–Da–Go condominium association are invalid. However, Mr. Ver Merris did suggest during his testimony that the portion of the association's liens related to the work allegedly necessary to complete the condominium project might not be enforceable. My own review of the Sun–Da–Go condominium association's bylaws and the applicable statute indicates that there is more than just a possibility. The Sun–Da–Go condominium associations's authority to claim a lien against the nine lots in which the bankruptcy estate now has an interest arises under Article V of the association bylaws. That article is titled "Assessments." Section 2 of Article V directs the condominium association's board to estimate the funds necessary to defray common expenses incurred by the association on behalf of all lot owners and then to allocate the estimated amount among all lot owners as an assessment to be paid on a monthly basis. Such assessments are commonly referred to as condominium dues. Section 2 further provides that the monthly dues may be increased by the association board without member approval under certain circumstances (*e.g.,* repair and replacement of existing Common Elements (a defined term)) and with 60% approval (both by number and in value) of the lot owners under all other circumstances. Section 4 of Article V then describes what the Sun–Da–Go condominium association may do to collect the assess-

ments contemplated in that article. Included among the collection devices is the automatic imposition of a lien against each owner's lot.[26]

However, the Sun–Da–Go condominium association has not characterized the $31,180 claim for the uncompleted road and the boat launch[27] as an obligation of the condominium association which is to be shared by all lot owners. Rather, the Sun–Da–Go condominium association asserts that the entire $31,180 must be paid by Mr. Engman because it is an obligation due the condominium association by him as a co-developer of the condominium project. More specifically, the $31,180 represents the condominium association's claim for damages against Mr. Engman for his failure to complete the condominium project as agreed.

Nor does MICH. COMP. LAWS ANN. § 559.208(1) lend any support for such a lien. That section authorizes liens only for "sums assessed to a co-owner" and then only "in accordance with the condominium documents." Therefore, the propriety of the Sun–Da–Go condominium association asserting a lien on account of this portion of its claim against Mr. Engman is suspect.[28]

2. *Calculation of the Claim Supporting the Condominium Association's Liens.*

a. *Calculation of Association Dues and Assessments.*

The condominium association's practice, which was consistent with the bylaws, was to assess dues for the prospective year based upon a May 1—April 30 fiscal year. The annual dues assessed against Mr. Engman and his former wife on account of their joint ownership of the nine unsold lots were:

| FY | Dues/Lot | Assessment Against 9 Unsold Lots | Engman's 1/2 Share | Former Wife's 1/2 Share |
|----|----------|----------------------------------|--------------------|-------------------------|
| 98 | $ 300 | $ 2,700 | $ 1,350 | $ 1,350 |
| 99 | 350 | 3,150 | 1,575 | 1,575 |
| 00 | 350 | 3,150 | 1,575 | 1,575 |
| 01 | 450 | 4,050 | 2,025 | 2,025 |
| 02 | 450 | 4,050 | 2,025 | 2,025 |

26. "Unpaid assessments shall constitute a lien on the Lot...." Art. V.4. Association Bylaws.

27. *See,* January 29, 2004 letter from Curtis Rypma to Larry Ver Merris. Engman Ex. 14.

28. Engman Ex. 17 is entitled "Claim of Lien for Developers Obligations." It was filed with the Kent County Register of Deeds on September 24, 2001. It is also attached to Engman Ex. 12, which is the proof of claim filed by the Sun–Da–Go condominium association to recover "Developer Obligations."

This claim of lien is different from the separate claim of lien that the Sun–Da–Go condominium association filed for unpaid association dues. That claim of lien is entitled "Amended Claim of Lien for Association Dues." It is attached to the separate proof of claim that the Sun–Da–Go condominium association filed in Mr. Engman's bankruptcy proceeding for "unpaid condominium assessments." Engman Ex. 13.

Interestingly, both the claim of lien for the developer obligations and the claim of lien for association dues reference the same page of the master deed as authority for imposing the lien (Liber 3573, Page 1370). That page of the master deed is in fact a page of the Sun–Da–Go condominium association bylaws because the bylaws are an attachment to the master deed. *See,* Engman Ex. 10. The provisions included on that page permit the imposition of a lien against any lot owner for unpaid dues and assessments (Art. V.4.). However, there is no provision on that page which permits the imposition of a lien against the developer's lots for unfulfilled developer obligations.

| 03 | 500 | 4,500 | 2,250 | 2,250 |
| 04 | 700 | 6,300 | 3,150 | 3,150 |
| | | TOTAL | $ 13,950 | $ 13,950 |

I have been able to find within the exhibits association minutes for only three of the meetings at which the condominium dues were determined.[29] These minutes do not explain how each annual assessment was determined. However, the minutes are quite clear that the total amount budgeted as necessary revenue from dues for each year was allocated among all 18 lot owners on an equal basis. For example, one can extrapolate from the minutes of the May 1, 1997 association meeting that the Sun–Da–Go condominium association set $5,400 as its budgeted revenue for FY 98 and that it then assessed each of the 18 lot owners $300 as dues to collect the budgeted amount.

The Sun–Da–Go condominium association's method for assessing Mr Engman's and his former wife's nine lots appears reasonable at first blush. However, the condominium association's calculations did not take into consideration Article V.5. of the association bylaws.

5. *Obligations of the Developer.*

    a.  Until the regular month [sic] assessments paid by Co-owners other than the Developer are sufficient to support the total costs of administration (excluding reserves), the Developer shall pay the balance of such administration costs on account of the Lots owned by it.

    b.  Once the regular monthly assessments paid by Co-owners other than the Developer are sufficient to support that total costs of administration (excluding reserves), the Developer shall be assessed by the Association for actual costs, if any, incurred by the Association that are directly attributable to the Lots being held by the Developer, together with a reasonable share of the costs of administration that indirectly benefit the Developer (other than costs attributable to the maintenance of dwellings), such as legal fees, accounting fees, and maintenance of the landscaping, drives, and walks. If a Lot owned by the Developer is leased or otherwise permanently occupied by a person holding under or through the Developer, the Developer shall pay all regular monthly assessments for the Lot. In no event shall the Developer be responsible for the cost of capital improvements or additions, by special assessment or otherwise, except for Lots owned by it.[30]

This section appears in the same article of the association bylaws as the section for calculating the annual dues (Art. V.2.) and the assessment and collection of those dues (Art. V.4.). Art. V.5. clearly exempts Mr. Engman as the co-owner of the remaining unsold lots from being assessed the dues required of the homeowners who

---

**29.** May 1, 1997, May 9, 1998, and March 3, 2002 meeting minutes are all found in Engman Ex. 20. In addition, I have found among the documents included in Engman Ex. 21 handwritten notes regarding dues on two agendas for the March 15, 1998 meeting. I say "have found" because Mr. Engman chose, without objection, to introduce as single exhibits whole volumes of unorganized documents regarding the Sun–Da–Go condominium association. For example, Engman Ex. 20 is 1 ¼" thick and consists of numerous documents.

**30.** Ex. A to Master Deed, Engman Ex. 10.

had purchased lots in the project.[31] Mr. Engman and his former wife, as co-developers, were instead responsible for only their reasonable share of the condominium association's indirect administrative costs (*i.e.*, the administrative costs that only indirectly benefitted the developers' unsold lots) once the association became self-supporting.[32] Although there is no guidance in the bylaws as to how one would go about calculating the "reasonable share," a fair method would be to add up all of the actual administrative costs at the end of each fiscal year and then assess the developers a per lot fee based upon this amount. For example, Sun–Da–Go condominium association's cash flow report for FY 01 indicates total cash expenditures of $3,625. The per lot allocation of this amount is $201.39 ($3,625 ÷ 18) and Mr. Engman's and his former wife's share would be $1,812.49.[33]

If the condominium association had used this approach, Mr. Engman and his former wife's fees for FY 98 through FY 04 would have been $7,324.51 as opposed to $13,950.

| FY | Total Cash Expenditures [34] | Per Lot | Engman Share | Former Wife's Share |
|----|------------------------------|---------|--------------|---------------------|
| 98 | $2,058.78 | $114.38 | $ 514.71 | $ 514.71 |
| 99 | 2,479.17 | 137.73 | 619.79 | 619.79 |
| 00 | 5,664.86 | 314.75 | 1,416.22 | 1,416.22 |
| 01 | 3,625.00 | 201.39 | 906.25 | 906.25 |
| 02 | 6,469.51 | 359.42 | 1,617.38 | 1,617.38 |
| 03 | 4,592.57 | 255.15 | 1,148.14 | 1,148.14 |
| 04 | 4,408.09 | 244.89 | 1,102.02 | 1,102.02 |
| | | TOTAL | $7,324.51 [35] | $7,324.51 |

Consequently, Mr. Engman's argument that the association over-assessed him and the bankruptcy estate has merit.

**31.** Art. V.5.b. provides that the developer is to pay "all regular monthly assessments" for a lot if the lot has been leased by the developer or the lot has been otherwise permanently occupied by someone through or under the developer. The negative implication of this provision is that the developer may not be charged for the dues the other lot owners are required to pay so long as the lots the developer continues to own remain unleased and otherwise unoccupied.

**32.** The association cash flow reports for FY 98 and FY 99 (included in Engman Ex. 21) indicate that the association had a positive net cash flow of $1,741.32 for its first year, which was more than sufficient to offset its negative cash flow of only $429.17 during its second year. Therefore, it is fair to conclude that the association was self-supporting from its inception.

**33.** Mr. Engman and his former wife would have been billed for their respective shares of this amount sometime after the close of the

### b. *Calculation of Interest.*

The Sun–Da–Go condominium association's claim for interest is based for the fiscal year. The assessment of this amount, if paid, would result in additional revenue to the association which either could be rebated to the other lot owners or applied to future dues.

**34.** FY 98 through FY 04 cash flow reports for the condominium association included in Engman Ex. 21.

**35.** The cash flow reports for some of the years indicate cash expenditures for legal fees. The condominium association's minutes do indicate that the association was incurring legal fees in connection with defending a lawsuit unrelated to Mr. Engman. However, to the extent the referenced legal fees related to efforts by the condominium association to collect dues from Mr. Engman, these amounts should be excluded from this calculation because they are included separately as direct collection costs owing by Mr. Engman.

most part upon its claim of $13,950 for unpaid dues and assessments. If the amount that the condominium association was entitled to actually assess Mr. Engman for condominium expenses was only 53% of what he was in fact charged,[36] then a rough estimate of the interest he would have owed on the reduced assessment is $2,468.86 instead of the $4,702.10 the Sun–Da–Go condominium association in fact claims.

### c. *Calculation of Attorneys Fees.*

The association bylaws provide that the condominium association may recover actual attorneys fees incurred in the collection of assessments owed by the lot owners. The record includes itemizations from the condominium association's attorneys, Schenk, Boncher and Rypma, that support the $30,567 amount claimed as owing by Mr. Engman on account of his unpaid dues and assessments.

Mr. Rypma, in justifying a $30,567 bill to collect $13,950 in unpaid fees, stated to Mr. Ver Merris that "any lawsuit with John [Engman] could not be quickly or reasonably resolved."[37] However, even if Mr. Rypma's observation is accepted as true, there is still considerable reason to question the propriety of the amount charged. First, Schenk, Boncher and Rypma's itemization indicates that the condominium association's attorneys billed $6,360 (42.4 hours of time at the rate of at least $150) through December 1999. However, the state district court's second amended final judgment, which is dated January 4, 2000, awarded the association only $2,300 for

attorneys fees incurred for this time period.[38]

Second, the itemization indicates that the condominium association billed another 75 hours between the January 2000 entry of the second state district court judgment and Mr. Engman's December 28, 2001 bankruptcy petition. The value of this time at $150 per hour is $11,250. However, it appears that most of this time relates to Mr. Engman's successful appeal of the January 2000 state district court judgment.[39] An argument certainly can be made that the condominium association's right to recover actual attorneys fees from Mr. Engman does not encompass fees incurred by the association in connection with Mr. Engman's successful appeal of the state district court's decision.

Third, Mr. Engman's other substantive defenses to the condominium association's collection of dues from him cast doubt upon the collectibility of any attorneys fees. Mr. Engman has a legitimate argument that nearly half of the dues the condominium association has been attempting to collect from him are not owed. Consequently, it is fair to ask why Mr. Engman, and now his bankruptcy estate, should have to finance the condominium association's pursuit of its claim if it is ultimately determined that a significant portion of it is invalid.

### d. *Calculation of Damages for Road and Boat Launch.*

It is unclear as to what were the developer's remaining responsibilities concerning the completion of the project at the time the settlement was reached and what

---

**36.** $7,324.51 / $13,950 = 53%.

**37.** January 29, 2004 letter from Mr. Rypma to Mr. Ver Merris, Engman Ex. 14.

**38.** The January 14, 2000 state district court judgment is an attachment to the January 29,

2004 letter from Mr. Rypma to Mr. Ver Merris, Engman Ex. 14.

**39.** *See,* Kent County Circuit Court order dated December 10, 2001. Engman Ex. 2.

is the cost to perform those responsibilities. Although Mr. Engman asserted at times during the hearing that the project was complete, he at other times conceded that work still remained to be performed with respect to at least the boat launch. Moreover, prior filings by Mr. Engman in his bankruptcy proceeding indicated that more work had to be done. For example, Mr. Engman attached to his March 6, 2002 response to the United States Trustee's conversion motion a "punch list" of what he believed was required to complete the project.[40] The list, which is included in a June 29, 2000 quote from Dan Valley Excavating, Inc.[41] identifies the following items as requiring completion:

- 4″ concrete slab for boat launch
- Sealcoat existing road
- Finish split rail fences
- Rip rap at culvert ends
- Traffic signs, Stop, Yield, Stop Ahead
- Restore barrow pit, grade, topsoil, seed

The Dan Valley Excavating, Inc. quote indicates that all six of these items could be completed for $23,048.80, exclusive of permits and inspection fees. In contrast, the A–1 Asphalt, Inc. quote upon which the Sun–Da–Go condominium association relies for the project completion portion of its purported liens is for $31,180. Moreover, the A–1 Asphalt quote appears to relate only to the boat launch, seal coat and culvert items in Mr. Engman's punch list. The remaining items, those being the fence, the signs, and the barrow pit, would add, at Dan Valley Excavating's pricing, another $8,690 to the A–1 Asphalt quote. Conversely, the elimination of the fence, the signs, and the barrow pit from the Dan Valley Excavating quote would reduce its quote for the boat launch, the seal coat and the culvert to $14,358, which is less than one-half of what A–1 Asphalt quoted for the same items.

Mr. Schellenberg, the state court appointed receiver, also agreed that Mr. Engman and his former wife, as co-developers, still had items to complete with respect to the project. Mr. Schellenberg's list is set forth in a balance sheet-type statement regarding the Sun–Da–Go condominium project's value as of August 1996.[42] This balance sheet identifies the same items for completion as Mr. Engman's June 2000 "punch list."[43] However, the cost of road repair in Mr. Schellenberg's 1996 balance sheet ($900) is significantly less than the cost of road repair in Mr. Engman's 2000 punch list ($10,950) which, in turn, is significantly less than what appears to be the cost of road repair in the Sun–Da–Go condominium association's 2004 quote from A–1 Asphalt, Inc.[44]

Mr. Engman also introduced at the hearing a number of photographs of the

---

**40.** Debtor's March 6, 2002 Response and Memorandum to U.S. Trustee's Motion to Convert Case from Chapter 13. Trustee's Ex. F, p. 4. *See, also,* Debtor's January 13, 2002 proposed Chapter 13 plan. Trustee's Ex. E, p. 4.

**41.** Attached as Exhibit B to Mr. Engman's March 6, 2002 response.

**42.** Attachment to August 23, 1996 letter from Bob Schellenberg to John Engman, Engman Ex. 19.

**43.** *See,* Dan Valley Excavating quote attached to Trustee's Ex. F.

**44.** The A–1 Asphalt quote does not include a breakdown for other items included in the quote, such as the boat launch, and therefore it is impossible to determine how much more the A–1 Asphalt quote for road repair is in excess of the Dan Valley Excavating quote.

condominium project.[45]   Included among these photographs are pictures of asphalt being laid on the condominium roadway in 1996.  The photographs include other pictures, also taken in 1996, of a fully paved roadway within the condominium project.[46]

These pictures, coupled with the Sun–Da–Go condominium association's delay in raising the issue of road completion,[47] does put into question how much of the asserted completion costs set forth in A–1 Asphalt's 2004 quote relate to the developer's remaining obligations to complete the project and how much actually relates to maintenance and repair for a roadway which was nearly eight years old and which presumably had been subject during this time span to significant construction traffic as lot owners built their homes.  If some of the $31,180 claimed by the Sun–Da–Go condominium association for project completion is in fact related to regular maintenance and repair, then it would be more appropriate to treat this amount as a shared cost among all lot owners as opposed to a development cost to be paid entirely by Mr. Engman and his former wife.

3.  *Validity of the Claim Supporting the Condominium Association's Lien.*

a.  *The Condominium Association's Legal Authority.*

The record clearly establishes that the parties who had purchased lots in the Sun–Da–Go condominium project believed that the Sun–Da–Go condominium association was a legal entity in 1997 and that they, as members of the association, were legiti-

mately causing the association to assess dues and otherwise engage in activities contemplated by the association's bylaws. For example, the lot owners met and made decisions on behalf of the association and there are numerous documents that one or another lot owner signed as an officer of the condominium association.

Mr. Engman nonetheless asserts that the lot owners were never acting on behalf of the Sun–Da–Go condominium association because the condominium association was never properly organized.  Mr. Engman's position is that the lot owners never had the authority to elect a board of directors for the condominium association or to otherwise authorize actions by the condominium association.

Mr. Engman's argument is worth considering.  The master deed for the Sun–Da–Go condominium project contemplates the creation of a non-profit corporation (*i.e.*, a condominium association) to administer and maintain the project.[48]  Mr. Engman did not incorporate the condominium association when he recorded the master deed in late 1994.  Indeed, the condominium association was not incorporated until December 12, 1996.  Mr. Schellenberg, as the then appointed receiver of both Mr. Engman's and his former wife's developer rights in the project, was the incorporator. Mr. Schellenberg also named himself as the one and only member of the Sun–Da–Go condominium association's first board of directors.

Mr. Schellenberg's decision to appoint himself as the only member of the condominium associations' board of directors is consistent with the master deed and the association bylaws.  Both documents con-

---

45.  Engman Ex. 47, pp. 7–8.

46.  Engman Ex. 47, p. 6.

47.  There is no reference to "road completion" in the condominium associations minutes un-

til March 2002.  The May 1, 1997 minutes do, however, refer to "road repairs."

48.  Master Deed, Art. 2.2, Engman Ex. 10.

template control of the association being vested initially with the developer with control then being gradually transferred to the lot owners as the developer sold more and more of the lots. A pivotal event with respect to this transition was the "first annual meeting" of the condominium association. This meeting is defined in the master deed as "the initial meeting at which non-developer Co-owners are permitted to vote for the election of all directors and upon all other matters which may be brought before the meeting." [49]

The master deed and the association bylaws are at odds as to when the "first annual meeting" is to take place. Art. III.1 of the association bylaws states that the meeting is to take place no later than 120 days after the developer has conveyed 25% of the lots that may be created in the project. On the other hand, Article 2.17 of the master deed indicates that the meeting is to be held after 50% of the lots which may be created are sold but only at the developer's discretion. The association's articles of incorporation provide that the master deed is to control when there is a conflict between the master deed and the bylaws.[50]

The parties agree that nine lots had been sold to non-developers as of February 1997. Therefore, it appears at first blush that it was appropriate for Mr. Schellenberg to call the first annual meeting when he did because nine of the eighteen existing lots had been sold.[51] However, Article 2.17 of the master deed bases the 50% calculation not upon the existing lots but rather upon the total number of lots that could be created and the master

deed sets the maximum number of lots at 25 as opposed to just the 18 lots contemplated in the first phase.[52] Therefore, the 50% threshold required by Article 2.17 of the master deed had technically not been met in 1997 and consequently the May 1, 1997 association meeting at which the non-developer owners effectively took control of the Sun–Da–Go condominium association was arguably invalid.

However, "technically" and "arguably" are appropriate adjectives under the circumstances because Article 2.17 of the master deed ultimately leaves the calling of the first annual meeting to the developer's discretion. In other words, it was for the developer to decide whether and when a first annual meeting is to be called once the 50% threshold had been crossed so long as no more than four and one-half years had passed since the first lot was sold. Consequently, it stands to reason that the developer, in his sole discretion, was also able to waive the 50% threshold altogether and call the first annual meeting at any time. Indeed, that is exactly what Mr. Schellenberg appears to have done when he arranged with the nine lot owners to have the first annual meeting on May 1, 1997. Therefore, Mr. Engman's challenge of the property owners' exercise of authority on behalf of the Sun–Da–Go condominium association ultimately does not have much merit.

b. *Procedural Validity of the Sun–Da–Go Condominium Association's Actions.*

Mr. Engman also contends that he did not receive notice of a number of the con-

**49.** Master Deed, Art. 2.17, Engman Ex. 10.

**50.** Art. XVI, December 12, 1996 Articles of Incorporation, Engman Ex. 22.

**51.** Mr. Schellenberg met with the nine non-developer lot owners in February 1997 and he promised at that meeting that he would assist

them in forming their association. These lot owners then met on May 1, 1997 and they elected a new board of directors and new officers. All of the directors and officers elected were non-developer lot owners.

**52.** Master Deed, Art. 6.1.

dominium association's meetings and that there were other procedural defects in the way in which the condominium association assessed dues against him and then pursued him for their collection. Again, Mr. Engman's argument is worth considering.

Both the master deed and the association bylaws contemplate the association being operated through its board of directors.[53] Control of the board's membership, therefore, means control of the condominium association itself. Mr. Engman and his former wife, and then Mr. Schellenberg as their receiver, had the ability to control the Sun–Da–Go condominium association through their exclusive control of the association's board during the early marketing of the condominium project. However, that control shifted when Mr. Schellenberg called the first annual meeting of members on May 1, 1997. The members of the condominium association themselves were charged from that point on with the selection of the association's board of directors.

However, the developer did not necessarily lose all control of the condominium association with the commencement of the annual meetings. Indeed, the developer continued to have significant control over the board simply because the vote was based upon the number of lots owned. Consequently, the developer was in the position to dominate the election of board members for as long as there continued to be a significant number of unsold lots.

The association bylaws include a number of elaborate provisions to ensure that non-developer lot owners would have at least some representation on the condominium association board even when the developer continued to have the most number of votes. For example, the bylaws require that non-developer lot owners elect at least one-third of the board as soon as the non-developer owners own at least 50% of the lots that may be created in the development.[54] However, there is no corresponding protection for the developer during the early years of the condominium development and only 30% attendance by lot owners was required to constitute a quorum.[55] Therefore, it was possible under the Sun–Da–Go condominium association's bylaws for the developer to lose control of the association even when he had the votes simply by not appearing and voting at a meeting. It is for this reason that proper notice of the annual membership meetings to Mr. Engman was particularly important during the time frame in question.

The condominium association did not properly notify Mr. Engman of at least some of the annual membership meetings. The association bylaws require that notice of the annual meeting be in writing and delivered by mail at least ten days before the meeting.[56] However, a 1999 memo from the condominium association's secretary to its president indicates that the association's method of notifying members of meetings through at least May 1999 was simply to telephone the owner prior to the meeting and to leave an answering machine message if he or she was not home.[57] The memo further states that the association notified Mr. Engman in this manner for the May 1998 and May 1999 annual meetings.[58] Mr. Engman did not attend either of these annual meetings.

---

53. Master Deed, Article 2.2; Association Bylaws, Art. IV.1.

54. *See,* Association Bylaws, Art. III.4.

55. *See,* Association Bylaws, Art. III.5.

56. Association Bylaws, Art. III.2.

57. June 17, 1999 memo from Judy Beasley to Donna Cole, included in Engman Ex. 20.

58. The memo also indicates that Mr. Engman received only telephonic notice of the first membership meeting held on May 1, 1997 and that Mr. Engman did not attend that

Moreover, the association bylaws also require the association to maintain detailed records of its revenues and expenditures and to provide its members with a financial statement from these records at least annually. Mr. Engman asserts that he was never provided with any financial statements despite his many demands. A pre-meeting distribution of financial statements was likely only if the association also gave written notice of the meeting. Therefore, it is fair to conclude that Mr. Engman did not receive financial statements for the annual meetings he did not attend in May 1998 and May 1999 because he had at best received only telephonic notice of those meetings.

The Trustee argues that Mr. Engman's attendance at the meetings was irrelevant because he was ineligible to vote even if he had attended. The Trustee's argument is based upon the fact that Mr. Engman was delinquent in the payment of his dues at all times. The Trustee then points to Art. II.3 of the association bylaws.

> The Developer may vote only for those Lots to which it still holds title and for which it is paying the full monthly assessment in effect when the vote is cast.

However, this provision is ambiguous. It may, as the Trustee asserts, limit the developer's right to vote. On the other hand, it may also be simply giving further definition to the number of votes to which the developer would be entitled. The developer's share of the condominium association's administrative costs once the association became self-supporting is based upon not only the number of lots the developer continued to own but also upon the number of lots that were permanently occupied by

persons "holding under or through the Developer." [59] Consequently, the sentence referenced by the Trustee in Art. II.3. of the association bylaws may in fact be only clarifying that the developer, when voting, is entitled to cast a vote not only with respect to each lot in which the developer continues to hold title but also with respect to each lot which he has transferred but for which he continues to be fully assessed for administrative costs because the transferee continues to hold the lot "under or through the Developer." The latter interpretation seems more likely given that this interpretation also avoids having to explain why Mr. Engman, who drafted the association bylaws, did not make other lot owners ineligible to vote if they too were delinquent in their monthly dues. Therefore, Mr. Engman's arguments concerning the procedural propriety of the condominium association's actions during at least 1998 and 1999 have sufficient merit to raise additional questions as to why the Trustee chose ultimately to pay in full the amount assessed by the condominium association against Mr. Engman for those years.

B. *Application of Business Judgment Rule.*

■■ As already discussed, a Chapter 7 trustee is to be given considerable deference with respect to the settlements he or she makes on behalf of the bankruptcy estate. This deference manifests itself in the business judgment rule.

There are many rationales for the business judgment rule. It encourages competent individuals to oversee the management of corporations which may have hundreds, if not thousands, of interested shareholders. *See, e.g., Briggs*

---

meeting. However, it appears that Mr. Schellenberg was still the receiver at that time and therefore it was Mr. Schellenberg, and not Mr. Engman, who was entitled to notice with respect to that meeting.

**59.** Association Bylaws, Art. V.5.b.

*v. Spaulding*, 141 U.S. 132, 149, 11 S.Ct. 924[, 35 L.Ed. 662] (1891); *Granada Investment[s], Inc. v. DWG Corp.*, 823 F.Supp. 448, 454–455 (N.D.Ohio 1993). It permits directors to take risks and it provides dynamic leadership without fear of judicial hindsight. *In re Consumers Power Co. Derivative Litigation*, 132 F.R.D. 455, 464 (E.D.Mich. 1990); *FDIC v. Castetter*, 184 F.3d 1040, 1044 (9th Cir.1999). It prevents courts from becoming entangled in complex corporate decisions by deferring to the judgment of skilled business persons provided that those persons comply with certain minimum standards.

> [A]fter-the-fact litigation is a most imperfect device to evaluate corporate business decisions. The circumstances surrounding a corporate business decision are not easily reconstructed in a courtroom years later, since business imperatives often call for quick decisions, inevitably based on less than perfect information. The entrepreneur's function is to encounter risks and to confront uncertainty, and a reasoned decision at the time made may seem a wild hunch viewed years later against the background of perfect knowledge. *Joy v. North*, 692 F.2d 880, 886 (2d Cir.1982), *cert. denied* 460 U.S. 1051[, 103 S.Ct. 1498, 75 L.Ed.2d 930] (1983).

Application of the business judgment rule in the context of the administration of the bankruptcy estate achieves similar objectives. If estates are to be administered outside the purview of the bankruptcy court, then the system should encourage competent individuals to serve as trustees of the bankruptcy estates. The reorganization or liquidation of a distressed debtor requires as much, if not more, creativity and risk-taking as the management of a healthy entity. Bankruptcy courts should be no more willing to second guess competent, disinterested trustees and debtors-in-possession than other courts are willing to second guess competent, disinterested directors.

*In re Dalen*, 259 B.R. 586, 609–10.

■ However, the business judgment rule is not without bounds. There must be at least some rational business purpose to support the disinterested trustee's decision. In addition, the decision process itself must evidence at least rudimentary due diligence. *Dalen* at 609.[60]

■ The Trustee's desire to reach a quick resolution of the liens claimed by the Sun–Da–Go condominium association is clearly rational. However, what is not rational is the Trustee's decision to pay the condominium association $101,042, which is everything that the association claimed it was owed. The record clearly establishes that the Trustee did not exercise the due diligence required of him to overcome Mr. Engman's contention that the Trustee did not exercise good business judgment.

Both the Trustee and Mr. Ver Merris, his attorney, maintained at trial that there was little basis to contest the condominium association's lien. Specifically, Mr. Ver Merris identified only the funds escrowed in the state district court litigation as a possible challenge.[61] As for the Trustee

---

**60.** In other words, the trustee cannot be "grossly negligent" in connection with the investigation and analysis underlying the ultimate decision reached. *Id.*

**61.** Mr. Engman had deposited $2,900 with the state district court sometime prior to the commencement of his bankruptcy proceeding. The purpose of the deposit was to cover at least some of the dues then claimed by the condominium association as owing by Mr. Engman. Approximately $1,500 of this amount remained on deposit when Mr. Engman filed his petition. The Trustee asserted

himself, he indicated that he had no issue with the condominium association other than with respect to perhaps the amount of its claimed attorneys fees.

The Trustee based his decision to pay the condominium association in full without challenge largely upon information that had been provided to him by members of the condominium association and the association's attorney. Although the Trustee had been aware of the condominium association's claimed lien since the summer of 2002, the Trustee had very little information concerning the claim when the Trustee began actively pursuing the sale of the remaining lots in the fall of 2003.[62] Mr. Ver Merris did at that time ask Mr. Rypma, the condominium association's attorney, for additional information to support its claimed liens. Unfortunately, Mr. Rypma was not forthcoming despite what Mr. Ver Merris described as his "pestering." Indeed, it was not until August 2004, well after the Trustee had reached his agreement with the condominium association, that the requested information was finally delivered to the Trustee.

Mr. Rypma did provide the Trustee with his own summary of the condominium association's lien claim in a January 29, 2004

letter to Mr. Ver Merris. While Mr. Ver Merris testified that it would have been nice to have had all of the supporting documentation at that time, the Trustee elected instead to resolve the lien claim based upon what information he did have. Again, the Trustee's February 2004 decision was to pay in full the $101,042 claimed by the Sun–Da–Go condominium association on account of its liens.

The Trustee clearly took a "their word/ his word" approach when he evaluated the condominium association's claimed liens in February 2004. Mr. Ver Merris testified that he was comfortable relying on the accuracy of what Mr. Rypma contended represented the legitimate claims against Mr. Engman and the unsold lots. For example, Mr. Ver Merris testified that he had no reason to challenge the attorneys fees claimed by the condominium association based upon Mr. Rypma's representation that there had been a lot of litigation with Mr. Engman over the dues assessed against his lots.

On the other hand, the Trustee did not give much credence to what Mr. Engman had to say because of the Trustee's prior experiences with Mr. Engman in this case.[63] Moreover, the Trustee had docu-

---

that the condominium association should have given the bankruptcy estate credit for this remaining amount.

**62.** Mr. Engman's bankruptcy proceeding has taken a tortuous path. He commenced his proceeding on December 26, 2001 as a Chapter 7 case. However, he filed a motion to convert the case to a Chapter 13 proceeding shortly thereafter. On March 26, 2002, I granted Mr. Engman's motion to convert his case to a Chapter 13 but I also granted the UST's motion to immediately re-convert the case to a Chapter 7 pursuant to Section 1307(c) on the basis that the contemplated Chapter 13 proceeding was not in good faith. Mr. Engman appealed the re-conversion order and the district court, sitting as an appellate court, reversed and remanded that order

on March 27, 2003. The consequence of the district court order was the reinstatement of the Chapter 13 proceeding and the attendant displacement of the Chapter 7 trustee. However, Mr. Engman voluntarily consented to the re-conversion of his bankruptcy proceeding to a Chapter 7 on October 7, 2003. It was the October 2003 re-conversion of the case to Chapter 7 which prompted the Trustee to renew his efforts to liquidate the lots and it was his renewed efforts which in turn prompted his further investigation regarding the condominium association's claimed liens against those lots.

**63.** Mr. Ver Merris, who made this comment about Mr. Engman's credibility, did not elaborate upon what had previously transpired. However, I do observe that there have been a

mentation where the state district court awarded the FY 98 through FY 00 dues [64] and where Mr. Engman otherwise appeared to be acceding to the propriety of these assessments. Finally, the other co-owners of the unsold lots (*i.e.*, Mr. Engman's grown daughters) had advised the Trustee that they did not want to contest the condominium association's claimed liens.

However, the soundness of the Trustee's evaluation is undermined by the master deed and the accompanying association by-laws. For example, the condominium association's claim for dues against Mr. Engman and his former wife as co-owners of the unsold lots was premised on the association's belief that they were to be treated no differently than any other lot owner with respect to annual dues. Indeed, Mr. Ver Merris testified that he made this same assumption based upon his own experience as a treasurer of a local park association.

However, Art. V.5. of the association bylaws clearly provides that the developers of the project (*i.e.*, Mr. Engman and his former wife) were not to be assessed dues as if they were just another lot owner. Indeed, the evidence presented at the hearing established that the association may have over-assessed Mr. Engman and then the bankruptcy estate by as much as $6,626 for FY 98 through FY 04. The Trustee has offered no explanation as to why this issue was not raised with the Sun–Da–Go condominium association in

early 2004 when the Trustee was making his decision as to how to resolve its claimed lien. Mr. Ver Merris testified that he had read the master deed and association bylaws when they were first received in 2002 and that he also had at least some of the association's revenue and expense records at that time. Nonetheless, it does not appear that the Trustee critically evaluated this issue when he settled with the condominium association in February 2004.

■■■ The Trustee's duty as a fiduciary to exercise care in his resolution of disputes with third parties requires him to consider "all material facts reasonably available." *In re Dalen*, 259 B.R. at 609 (quoting from *Brehm v. Eisner*, 746 A.2d 244, 264 n. 66 (Del.2000)). In this instance, the Trustee acceded to the condominium association's lien claim without critically examining the legal documentation necessary to establish its validity. As a result, he overlooked material issues that bear directly on what amount was to be paid to the Sun–Da–Go condominium association.

I note at this juncture that the ramifications of the Trustee's failure to critically evaluate the association bylaws extends beyond just the potential $6,626 savings in dues owed by Mr. Engman and the bankruptcy estate. First, the adjustment in dues would have also resulted in a corresponding adjustment in the interest claimed. This additional adjustment could have been as much as $2,200. Second, and more important, the attorneys fees assert-

---

number of contentious hearings between Mr. Engman and the Trustee over the course of Mr. Engman's bankruptcy proceeding and each party has been critical of the other in many of these hearings.

**64.** Mr. Rypma had in his January 29, 2004 letter provided the Trustee with a "Second Amended Final Judgment" dated January 4, 2000 from the state district court which

awarded the condominium association "$4,500 for assessments from 1997–1999" against Mr. Engman. However, Mr. Rypma did not advise Mr. Ver Merris in that letter that the judgment had been reversed on appeal. Mr. Ver Merris himself testified that he was otherwise unaware of the reversal because the appellate court order was not in the state district court file when he reviewed it.

ed by the association, which represent nearly a third of the condominium association's $101,042.90 claim, are also rendered suspect. There is no question that the association is entitled under its bylaws to recover actual attorneys fees incurred by it in collection of dues and other assessments against the various lot owners. However, that right is premised upon the fees being incurred in connection with the collection of dues properly assessed. In other words, a plaintiff may not recover attorneys fees if the plaintiff's underlying cause of action is itself unsuccessful. *See, e.g.,* M.C.R. 2.625(A)(1), (B)(2), and (B)(4). There is already the question of whether the association's attorneys fees attributable to its unsuccessful efforts to contest Mr. Engman's appeals of both state district court orders are properly included in its lien claim. That the association apparently had no right to collect a material portion of the dues in the first place puts into question whether any of the $30,597 attorneys fees is owed at all.[65]

It is also important to remember that the Trustee's challenge of the condominium association's claim for dues, interest and attorneys fees did not have to be ironclad. Indeed, Mr. Engman's objection would have been blunted had the Trustee reached a compromise with the condominium association with respect to its claim. However, the record establishes that the Trustee's pursuit of a compromise was nominal at best. The Trustee simply accepted at face what the condominium association's attorney chose to provide him in late 2003 and early 2004 as the amount claimed by the association for unpaid dues and related costs.

The Trustee also passed over the opportunity to bargain down the condominium association's $31,180 claim to complete the project. As already discussed, the condominium association's ability to add this claim to its lien was suspect. In addition, the claim may have been high given that Mr. Engman had procured an earlier quote for a much lesser amount and that the road had been subject to eight years of use when the condominium association procured its quote. Again, it was not necessary that these questions concerning the association's remaining $31,180 claim be resolved ultimately in the bankruptcy estate's favor. It was enough that they represented legitimate bargaining chips for the Trustee to use in conjunction with his discussions concerning what had to be paid to the Sun–Da–Go condominium association in order for it to release its liens against the subject lots.

The Trustee, in his defense, did argue that there were other factors which justified his final agreement to pay in full what the condominium association claimed as its liens. However, none of them are sufficiently compelling to excuse his failure to press the condominium association for a resolution of its liens based upon some reduced amount.

The primary concession that the Trustee was able to gain from the condominium association was what the Trustee characterized as the association's agreement to assume the bankruptcy estate's duties and responsibilities as a co-developer of the project. According to the Trustee, this concession was valuable not only because it relieved him of this responsibility but also because it eliminated a lingering question

**65.** Mr. Erland, one of Mr. Engman's former attorneys, testified that it was his understanding that the condominium association's attorneys were representing the association on a contingency basis. If true, then that fact might also have a bearing upon how much the condominium association could ultimately recover from Mr. Engman as its actual attorneys fees.

the Trustee had as to his authority to complete whatever tasks remained in the development of the condominium project. *See,* 11 U.S.C. § 721. However, what was exactly agreed upon between the condominium association and the Trustee with respect to the remaining responsibilities of the developer is unclear. All that evidences this agreement is a one sentence statement by Mr. Ver Merris and a one sentence response by Mr. Rypma, the condominium association's attorney in a February 2004 exchange of letters.[66] What is clear from this exchange is that the condominium association would engage a contractor to perform the work contemplated in the $31,180 quote attached to Mr. Rypma's January 29, 2004 letter to Mr. Ver Merris. In other words, the Sun–Da–Go condominium association agreed that it would assume responsibility for completing the boat launch and the dock and for repairing and resurfacing the road.

What is not clear is whether the agreement also contemplated the condominium association's assumption of all other existing and future development responsibilities the bankruptcy estate might have with respect to the project. For example, one of Mr. Engman's former attorneys had advised the Trustee as early as September 2002 that the developers' documentation of the project was still incomplete because of problems with the lot lines. It further appears that this problem remained unresolved when the Trustee struck his agreement with the condominium association in February 2004. There is no reference to this remaining responsibility in the brief written exchange which evidences the agreement reached. While the Trustee would certainly argue that the February 2004 letter agreement was intended to resolve all issues concerning the bankruptcy estate's responsibility as the developer of the project, there is clearly room for the condominium association to argue that the two sentences that represent this agreement should be narrowly construed and that the bankruptcy estate continues to be responsible for other remaining development issues outside the completion of the boat launch, dock, and road.

The value of the agreement reached is therefore questionable. At best, the Trustee faces future litigation with the Sun–Da–Go condominium association with respect to the unresolved lot lines and whatever else may arise in the future that is unrelated to the boat launch, dock, and road. At worst, the Trustee has negotiated nothing more than an agreement for Sun–Da–Go to use the bankruptcy estate's money to complete those remaining items which the Trustee himself could have com-

---

66. Mr. Ver Merris testified that the agreement is memorialized in two letters exchanged between Mr. Rypma, the Sun–Da–Go condominium association's attorney, and him. Both letters are dated February 16, 2004. *See,* Engman Ex. 31 and 32.

Mr. Ver Merris' letter stated:

Before making such payments to the Sun–Da–Go Association, however, we want to be assured that the Association will then be responsible for completing the various matters described in your correspondence, including completion of the boat launch, dock, resurfacing the asphalt road, and other outstanding work which needs to be performed to complete the development.

Mr. Rypma's responsive letter stated:

We agree with your assessment that in the event that Sun–Da–Go Association is paid 1/9th of the total amount it is owed for each of the nine remaining lots, as the lots are sold, that Sun–Da–Go Association would then be responsible for completing the various items identified therein (boat ramp, paving roads, etc.) and the Trustee and Linda Leverich (or her estate) would be relieved of such responsibility going forward as joint "developers."

pleted for perhaps a much lesser amount.[67]

The Trustee also asserted that time constraints required him to resolve whatever disputes there might be with respect to the condominium association's claimed lien on terms less favorable than what otherwise might be justified. There is no question that the Trustee saw an advantage in securing a consensual release of the condominium association's claimed liens against the unsold lots in which the bankruptcy estate held an interest. However, the record does not establish that this advantage warranted a decision to pay in full all that the condominium association claimed was its due. While the Trustee did have prospective purchasers for six of the nine remaining lots when he made his agreement with the condominium association, the evidence does not support the contention that these sales had to be closed immediately in order to realize their value. It appears that the Trustee had time, if he so elected, to litigate the condominium association's lien claim. One of the functions of this court is to offer a forum where such issues can be adjudicated quickly so as to preserve the value of the bankruptcy estate's property. There is also nothing in the record to support the contention that equally suitable buyers could not have

been found at the conclusion of such litigation. Indeed, the record establishes that two of the three buyers remain even though the contemplated sales to them have yet to close.

The Trustee also alluded to title issues as a reason for reaching the agreement he did with the Sun–Da–Go condominium association. One obvious issue is that a buyer would want to purchase the entire lot and the bankruptcy estate had only a half interest to convey. The Trustee overcame this problem by securing from the co-owners their consent to the sales.[68] In fact, the current co-owners, who, again, are Mr. Engman's daughters, specifically instructed the Trustee to pay the condominium association "exactly 50% of the $101,042.80 owed Sun–Da–Go, for a total of $50,521.40 ... regardless of any future settlement or judgment regarding John Engman's dispute of the Sun–Da–Go bill."[69] Therefore, the Trustee did run the risk of the bankruptcy estate paying all future attorneys fees if he chose to continue contesting the condominium association's claimed lien. However, the bankruptcy estate also stood to benefit entirely from whatever reduction the Trustee could secure in the overall amount claimed by the association.[70]

---

67. The Trustee assumes that he, as the representative of the bankruptcy estate, lacked the authority to contract for the completion of the boat launch, dock, and road as demanded by the condominium association. However, I cannot discern from the record before me why these activities could not have been authorized by giving the Trustee limited authority to operate pursuant to 11 U.S.C. § 721 if in fact the Trustee did not already have the inherent authority under 11 U.S.C. § 704 to perform these tasks. Mr. Ver Merris also testified that, to the best of his knowledge, the Trustee had not made an independent assessment as to what was necessary to complete these items and that the Trustee had not attempted to obtain other quotes for the work demanded by the condominium association.

68. The Trustee did have the right to compel the sale of the other half as well pursuant to 11 U.S.C. § 363(h). However, procurement of that authority required the commencement of an adversary proceeding against Mr. Engman's daughters. Fed.R.Bankr.P. 7001(3).

69. December 10, 2004 letter from Stephanie Scruggs and Sari Jousma to Larry Ver Merris, Trustee's Ex. H.

70. If, for example, the condominium association had agreed or had been compelled to reduce its claim from $101,042.80 to $80,000, $50,521.40 of this amount would have been paid from the daughters' share of the proceeds and only the difference (i.e., $29,478.60) would have been paid from the bankruptcy estate's share.

The other title issue raised by the Trustee relates to the apparent refusal of some title companies to "insure over" on recorded liens notwithstanding the issuance of an order pursuant to 11 U.S.C. § 363(f). In this instance, I had ordered that the bankruptcy estate's interest in all of the subject lots be sold free of all liens, including the liens claimed by the Sun–Da–Go condominium association. The Trustee nonetheless argued that he had no choice but to procure the condominium association's consent at whatever cost because of this apparent title company practice. However, the Trustee did not establish that in fact the title insurance company he intended to use in closing these particular transactions was among those which had adopted this position. Nor did the Trustee establish that there was no other alternative to resolving this potential impasse. For example, it is conceivable that the Trustee could have negotiated a reduced lien claim with the condominium association and therefore still have procured the desired consent for purposes of title insurance. Whether the Trustee could have achieved this result will never be known because the Trustee chose instead to simply pay Sun–Da–Go's claimed lien without contest.

Finally, the Trustee identified the condominium association's agreement to accept $11,226.98 per lot as an advantage because it permitted the bankruptcy estate to retain a portion of the proceeds from each sale as opposed to having to wait until its lien was first paid in full. However, there is nothing in the record to suggest that the Trustee would not have gained this same concession from the condominium association had he challenged its claim and then negotiated. Moreover, apart from time-value considerations, the value of this particular concession is nominal on the assumption that the lots will hold their value over the foreseeable future.

To summarize, the Trustee did offer various rationales for reaching the agreement he did with the Sun–Da–Go condominium association concerning its lien claim. However, these rationales cannot justify his decision to pay in full what the condominium association claimed as due on account of its liens. A bankruptcy trustee should be given considerable leeway by the court in his or her decision-making and, therefore, Rule 9019(a) approval of a settlement reached should be given so long as good business judgment was exercised in reaching that settlement. However, the Trustee's oversight of critical issues relating to the validity and amount of the condominium association's lien claim, coupled with his decision to forgo any serious effort to negotiate a reduction of that claim, places the settlement agreed upon by the Trustee outside the bounds of what an informed business person would have accepted.[71]

## IV. CONCLUSION

Therefore, for the reasons stated in this opinion, the Trustee's request to approve his agreement to settle Sun–Da–Go condominium association's claimed lien in full as set forth in that request is denied. The

---

**71.** I acknowledge that I have not, as many courts do, evaluated the Trustee's decision by simply listing either the *W.T. Grant* or the *Drexel Burnham* criteria and then checking off each item in order. Checklists are too mechanical. They divert attention to trees when it is the forest which ultimately must be considered. *Dalen*, 259 B.R. at 613–14. Suffice it to say that I have taken into consideration the factors enumerated in *W.T. Grant* and *Drexel Burnham* in making my overall assessment of whether the Trustee has exercised good business judgment or not in reaching the settlement he did with the condominium association.

court will issue a separate order consistent with this opinion.